DAVID M. GREEN AND JOAN GREEN, SAMUEL MORITZ AND TILLIE MORITZ, ESTATE OF BURTON S. BROOKS, DECEASED, ANITA C. BROOKS, EXECUTRIX AND ANITA C. BROOKS, MICHAEL MANDEL AND ANITA C. BROOKS MANDEL, HORACE J. WALDMAN AND EDITH K. WALDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Green v. Commissioner
Docket No. 16616-83
United States Tax Court
T.C. Memo 1989-436; 1989 Tax Ct. Memo LEXIS 435; 57 T.C.M. (CCH) 1333; T.C.M. (RIA) 89436; August 17, 1989
Lowell E. Mann and Howard Philip Newman, for the petitioners. Raymond J. Farrell and Robert B. Van Grover, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In this case respondent determined deficiencies in petitioners' Federal income tax as follows: Deficiency
Addition to Tax
Petitioners
Years
Amount
I.R.C. Sec. 6651(a) [1]
David M. and Joan Green
1974
$  8,434
1975
12,263
1976
8,800
1977
6,649
1978
5,945
1979
5,113
1980
2,796
Samuel and Tillie Moritz
1974
8,777
1975
14,376
1976
10,899
1977
7,678
1978
5,883
1979
5,555
1980
3,354
Estate of Burton S. Brooks,
deceased, Anita C. Brooks,
Executrix, and Anita C. Brooks
1974
2,688
1975
2,365
$ 591.25
1976
2,254
1977
159
Anita Mandel (formerly Anita C.
Brooks)
1978
827
Michael and Anita Mandel
1980
809
Horace J. and Edith K. Waldman
1974
8,661
1975
14,164
1976
10,720
1977
7,468
1978
5,491
1979
4,874
1980
2,989
*439 Respondent has amended his answer to assert additional interest on substantial underpayments of tax attributable to tax motivated transactions under section 6621, which applies for periods after December 31, 1984. After concessions, [2] the issues for decision are: (1) Whether petitioners have established that the HGS partnership was organized and operated with an actual and honest objective of making a profit; (2) Whether the HGS partnership's nonrecourse note to Ramwell, Inc. was includable in its depreciable basis in the "King Arthur -- The Young Warlord" motion picture; (3) Whether the HGS partnership is entitled to investment tax credits claimed with respect to its interest in the motion picture; (4) Whether respondent properly changed the HGS partnership's method of depreciation from the double-declining-balance method to the income-forecast method in order to clearly reflect income; and (5) Whether petitioners are subject *440 to the increased interest rate on substantial underpayments of tax attributable to tax-motivated transactions under section 6621. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The three stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners David M. Green and Joan Green were married to each other and resided in Linden, New Jersey at the time the petition herein was filed. Petitioners Samuel Moritz and Tillie Moritz were also married to each other and resided in Linden, New Jersey at the time the petition herein was filed. Petitioner Anita C. Brooks Mandel resided in Scotch Plains, New Jersey at the time the petition herein was filed. Petitioner Estate of Burton S. Brooks is the estate of the deceased husband of Mrs. Anita C. Brooks Mandel. Petitioner *441 Michael Mandel resided in Scotch Plains, New Jersey at the time the petition herein was filed. He married Anita C. Brooks after the death of Burton S. Brooks. Petitioners Horace J. Waldman and Edith K. Waldman were married to each other and resided in Watchung, New Jersey at the time the petition herein was filed. In 1974, Burton R. Horowitz and Edward N. Schwartz were lawyers and in business together as labor consultants and negotiators. [3] At all times relevant petitioners-husbands Green, Moritz, and Waldman, and Burton S. Brooks (whose estate is a petitioner) were partners in a certified public accounting firm known as Moritz, Waldman & Green. *442 Heritage Enterprises, Inc. (hereinafter referred to as "Heritage") is a small publicly held corporation engaged in the business of marketing for commercial television. Arthur J. Steloff (hereinafter referred to as "Steloff") was at all relevant times president and a major shareholder of Heritage. He is engaged in the production of motion pictures through his own company, Heritage, and sometimes with other production companies. He is a member of the Motion Picture Academy of Arts and Sciences. Steloff has several years of experience in motion picture production. He has won film industry awards for his work in the productions "The Island of Dr. Moreau" and "The Black Fox." With respect to the distribution of motion pictures, however, Steloff (or Heritage) had managed only three or four attempts up to 1974, and none had been successful. Donald Havens (hereinafter referred to "Havens") was, at all relevant times until the end of 1975, vice president of Heritage and was in charge of its business affairs. In 1972 or 1973 Steloff began filming in England a production originally known as "Arthur of the Britons" and later known as "King Arthur -- The Young Warlord." Filming was completed *443 by the end of 1973 or early 1974. Production of "Arthur of the Britons" started as a television series; midway into production a decision was made to simultaneously produce a motion picture which was later called "King Arthur -- The Young Warlord" or simply "The Young Warlord." The undertaking was a joint production put together by Heritage in partnership with a British network called HTV and a German company, Beta Films. The three partners shared the production costs. Steloff used a cast of professional English actors including Oliver Tobias, Peter Firth, Brian Blessed, Michael Gothard, and Jack Watson, none of whom was at that time particularly well known to the public in the United States. Steloff used professional film directors, including Sidney Hayers, Peter Sasdy and Peter Hunt. The music for the production was written by Elmer Bernstein, one of the best known and most highly respected composers in the industry. Although Steloff stated that the television series "Arthur of the Britons" was distributed "successfully," Havens testified more specifically that the television series resulting from the production did not make any money. When the film version of the production *444 was completed, Steloff (or Heritage) needed money and wanted to find investors. He approached a Richard Wellbrock (hereinafter referred to as "Wellbrock") to help him sell the film. Wellbrock is a former director of Heritage and is a business broker. He was president of a corporation named Ramwell, Inc. Although he termed himself a "producer," Wellbrock regarded anyone who owned a film as a producer. Wellbrock apparently acted essentially as a broker between Heritage and prospective buyers. Wellbrock had brokered one or two films earlier, but could only recall the name of one of them. He was unaware, for example, whether "The Young Warlord" had been copyrighted, and he had no idea how the production costs of the film, said to be $ 1,100,000, had been determined. In late August or early September of 1974, Ramwell, Inc. acquired the movie "The Young Warlord" from Heritage for $ 750,000, paying $ 125,000 in cash and the rest in the form of a nonrecourse note for $ 625,000. [4] The record does not disclose the terms of the sales transaction between Heritage and Ramwell, Inc. for "The Young Warlord." [5]
*445 About the same time Ramwell, Inc. purchased the movie, Wellbrock contacted a number of individuals including petitioner-husband Green (hereinafter referred to as "Green"). Wellbrock provided Green with a "Confidential Memorandum" discussing the tax aspects of investing in films. The "Confidential Memorandum" stated in part: The primary tax advantage results from a combination of the leverage resulting from the nonrecourse note and the rapid write off of films for tax purposes. * * *. * * * It is apparent that the potential tax advantage illustrated above depends on leverage in the form of a substantial nonrecourse loan. * * *. Green, in turn, contacted Burton R. Horowitz (hereinafter referred to as "Horowitz"). Horowitz, an attorney who was later disbarred for obtaining perjured testimony, had been engaged to some extent in the field of entertainment as a rock music concert promoter. Horowitz, however, had also made other substantial investments, including investments in stocks. A meeting was set up between Wellbrock, Horowitz, and Green to discuss motion pictures. At the meeting, Wellbrock presented information about the film then known as "Arthur of the Britons" and *446 also information about an animal film. Horowitz was interested and a second meeting took place in September of 1974 between Steloff, Havens, Wellbrock, Green, Horowitz, Moritz, Waldman, and Schwartz at Green's office. Steloff made a presentation concerning various films which were available for purchase, his own background, the background of others involved in the various films, and information concerning Heritage as well as the motion picture industry in general. Horowitz himself later saw two of the available films, one the animal film, and the other "Arthur of the Britons." Horowitz preferred the film that became "The Young Warlord"; he did not like the animal picture. Horowitz was the only one of the group that became the HGS partners who saw the film before it was purchased, and he admitted he was not qualified to make an "intelligent determination" on the film. [6]
*447 Horowitz asked Green if he and his accounting partners, Moritz, Waldman, and Brooks, wanted to invest in the film, and they agreed to do so. They set up a new partnership, HGS Productions, for that purpose. [7] Accordingly, after a series of meetings with Wellbrock, Horowitz and Green agreed, on behalf of HGS Productions (hereinafter referred to as the "HGS partnership" or simply "HGS"), to buy the film. They placed $ 10,000 in escrow to hold the film. Green has been a certified public accountant since 1958. Green reviewed certain 1973 and early 1974 financial statements of Heritage that demonstrated to his satisfaction that the company was in good financial condition. Wellbrock had presented Horowitz with all of the contracts necessary for the HGS partnership to purchase the film, including a contract of *448 sale between Ramwell, Inc. and HGS and a distribution contract between HGS and Heritage. Horowitz wanted time to review the transaction and the documents, so he did not sign them immediately. At a meeting on November 22, 1974, negotiations took place until approximately 3:00 a.m. the next morning. Havens, the vice-president of Heritage, pointed out that Horowitz "negotiated almost for the fun of it * * *. And we spent a very long and difficult time, concluding successfully a transaction." At the end of the meeting the deal was consummated and HGS signed the agreements, purchasing the film from Ramwell, Inc. and engaging Heritage as the distributor. The rights acquired by HGS were the rights to exploit the motion picture in the domestic market and in foreign countries other than, "West and East Germany, West and East Berlin, Austria, Lichtenstein, Switzerland and that portion of Italy known as the Alto Adige, and the United Kingdom and Eire." The domestic market includes the United States and Canada and represents 50 to 60 percent of the world market for movies. HGS acquired the film from Ramwell, Inc. for a total stated price of $ 1,050,000, which price was later reduced to *449 $ 1,047,000. At the closing HGS paid Ramwell, Inc. $ 50,000 in cash. HGS agreed to pay an additional $ 33,333 on April 15, 1975, and $ 33,334 on July 15, 1975, and gave a nonrecourse note to Ramwell, Inc. in the amount of $ 875,000 payable in ten years with simple interest at six percent. Of the cash paid on November 22, 1974, $ 50,000 was paid pro rata by the partners of HGS. An additional amount of $ 58,333 was purportedly paid by Heritage, which purportedly loaned that sum to HGS on a nonrecourse basis. [8] The attendant nonrecourse note given to Heritage by HGS was unsecured and did not have a maturity date. The $ 58,333 amount of the note was to be paid without interest solely from HGS' share of the earnings from the movie. The agreement was that HGS would repay that amount from one-third of its share of receipts. HGS paid Ramwell, Inc. cash in the amount of $ 33,333 on April 15, 1975, and $ 33,334 on July 15, 1975. The partners of HGS actually paid the additional cash, in their pro rata shares, totaling $ 33,333 shortly before April 15, 1975, and an additional $ 33,334 shortly before July 15, 1975. HGS also gave a security interest in the film to Ramwell, Inc.; the security *450 interest was recorded on a UCC financing statement. The $ 875,000 nonrecourse note given to Ramwell, Inc. by HGS was due on December 31, 1984. The note was secured only by the security interest in the film and was payable solely out of 50 percent of HGS' earnings from the film in excess of the first $ 175,000. *451 At the time HGS purchased the film from Ramwell, Inc., it also entered into a distribution agreement with Heritage. HGS engaged Heritage to commercially exploit the film in all available media, but restricted to those territories in which HGS itself had acquired rights. HGS granted Heritage "sole, exclusive and irrevocable" distribution rights to the film. From domestic gross receipts received by Heritage as distributor, HGS would get 75 percent of the first $ 240,000 gross receipts; 35 percent of the next $ 1,000,000; 40 percent of the next $ 500,000; and 50 percent of any additional amounts. From foreign gross receipts, HGS was to get 80 percent of the first $ 220,000 in gross receipts, and 50 percent of any amounts received thereafter. To induce HGS to acquire "The Young Warlord" and to retain Heritage as the sole, exclusive and irrevocable distributor, Arthur Steloff, individually, and Heritage gave HGS a $ 60,000 "guarantee." [9] The Heritage "guarantee" was later increased to $ 90,000. In December 1975, Heritage paid HGS $ 30,295 as part of the $ 90,000 guarantee that Heritage gave HGS. In order to avoid putting Heritage out of business, in December 1975, the partners *452 of HGS personally loaned the money advanced by Heritage on the "guarantee" back to Heritage. See n.9, supra. In return, Heritage gave the individual partners promissory notes. Green calculated that, under the sales and distribution contracts, the HGS partnership would have to receive gross income from the movie of slightly more than $ 3 million in order to pay off the $ 875,000 nonrecourse *453 note to Ramwell, Inc. The feature film "The Young Warlord" was released where possible before the television series. The television series consisted of 24 one-half hour shows. Because the television series was shot in 16-millimeter film, the motion picture was shot also in 16-millimeter film. Steloff conceded, however, that the state of the art in 1974 was to shoot a theatrical motion picture in 35-millimeter, which, although more costly, produced a better quality picture. The procedure for theatrical distribution of a 16-millimeter picture was to blow it up to 35 millimeters, an operation Steloff called a "dangerous process." Blowing up the film results in a grainy picture and faded colors. In 1974 Heritage was not actively engaged in the theatrical distribution of motion pictures; its activities were primarily in the television area. None of the partners of HGS, including Horowitz, had any experience in the production or distribution of motion pictures. Horowitz did not receive a report of the earnings of the television series in its earlier United Kingdom release. He received no evidence of a copyright of the motion picture. The record does not show that HGS ever copyrighted *454 the motion picture. Ramwell, Inc. provided HGS with two appraisals of "The Young Warlord." The appraisals were uninformative, pro forma documents, and were received by the HGS partners several days after they had already purchased the movie. Even though none of the partners had any actual experience in the motion picture industry, no outside appraiser was ever retained to value the movie prior to its acquisition by HGS. The partners relied primarily on the glowing representations of Steloff who was admittedly trying to "hustle a deal." Other than general representations, no evidence was presented to any of the partners in HGS that the production cost of the movie was actually $ 1,100,000 as warranted in the contract dated November 22, 1974. The record in this case does not establish the amount of the production costs. Whatever the actual production cost of the movie, most, if not all, of such production cost was incurred in England where the filming occurred, with Heritage sharing such costs with its British and German co-venturers. Some post-production costs were incurred in studios in the United States, presumably solely by Heritage. The record does not establish the nature *455 and extent of the rights to the movie, if any, retained by the British and German co-venturers. At the time the movie was to be released theatrically, Heritage was having "serious financial problems." Heritage's theatrical release of the film was "a very minimal release done under bad conditions." A successful theatrical distribution is a "very very expensive proposition"; this was not achieved with the movie in the present case, because Heritage was not "able financially to carry the burden." HGS and Heritage had entered into their distribution agreement on November 22, 1974. Under the terms of that agreement, Heritage was obligated to release the movie theatrically by December 31, 1974. It was virtually impossible to release a movie properly in the short time period available to Heritage after it acquired distribution rights to the movie. For that reason Heritage's actual theatrical release was "minimal." As required by the distribution agreement, the film was "released" into a few theaters at the end of 1974, and HGS was advised of that fact by Heritage. As a result of this "release," HGS received $ 384.57 from Heritage. Heritage, in providing this film to a few theaters, *456 did not prepare theater trailers or "shorts," nor did it broadcast television and radio spots or prepare a press book. Heritage was financially incapable of preparing such a campaign in 1974. The "release" was not successful, and the film was withdrawn for revision. [10] On March 25, 1975, the film received a rating of "PG" from the Motion Picture Association of America, upon application by Heritage. Heritage, acting through Steloff, attempted to distribute the film theatrically by first going to the major studios such as Warner Brothers, Columbia Pictures, Paramount, etc., but was unsuccessful. Steloff next tried to distribute the film through the so-called "mini-majors," such as American International Pictures (hereinafter referred to as "AIP"), Avco Embassy, and Orion. In June of 1976, Heritage made a deal with AIP placing the majority of Heritage's *457 film inventory, including 40 feature films and several television series, in the hands of AIP for a very low distribution fee. "The Young Warlord" was included in the Heritage-AIP deal. Heritage and AIP were working on several projects at the time the deal was made and Steloff felt comfortable in dealing with AIP. Heritage granted AIP the sole and exclusive right, license and privilege to distribute those films and series on television in the United States. The United States is the major television market in the world. Although HGS had a right to audit Heritage's subsequent receipts from the motion picture, HGS never conducted an audit. In August of 1976, Green wrote to Steloff inquiring about the quarterly earnings statements for 1974 through 1976 which had not been received and requesting information about the AIP contract. AIP, however, did not distribute Heritage's movies, including "The Young Warlord," and simply put those films and series on the shelf. Heritage ultimately sued AIP, spending approximately $ 500,000 in legal fees. The lawsuit between Heritage and AIP was not settled until June 1, 1979, and Heritage at that time regained the right to distribute the properties *458 it had licensed to AIP. Horowitz wrote a letter dated April 15, 1977, to Steloff, demanding the additional $ 60,000 that Heritage had promised as a guarantee. During the time the exclusive distribution deal with Heritage and/or AIP was in effect, however, Horowitz purportedly contacted others in the motion picture business about marketing the motion picture. However, neither HGS nor Horowitz had any right to distribute the movie under the terms of the distribution agreement with Heritage. Heritage had the sole right to distribute the movie, and HGS did not have the right to change distributors. Among others Horowitz allegedly contacted was his original advisor, Bud Fillipo, who was unable to help him. Horowitz showed the film to Edward Tone, an acquaintance. Tone met Mr. Carlos, a representative of Brazil, through Ed Murphy of Bit Media, one of the largest advertising time buyers in the country. Tone and Carlos negotiated a promotion whereby Carlos would purchase the rights to exploit the film in South America for three years for a minimum royalty of $ 300,000 to be split 50/50 between Tone and HGS. Steloff, however, vetoed the deal. Assuming that Horowitz in fact made the *459 above-described attempts to distribute the film, it is clear that Heritage (and/or AIP) had sole distribution rights to the film at that time. In 1980 Horowitz, on behalf of HGS, sued Steloff and Heritage. That suit was still pending at the time of the trial in this case. Notwithstanding the pendency of that litigation, in 1983 Steloff wrote to Horowitz inquiring whether, "as I have discussed with you," the partnership would be interested in investing in "YOUNG WARLORD, PART II." The letter continued -- As you know on the original "YOUNG WARLORD" we had to wait for the market to accept action/adventure with historic overtones (a costumer); the market is now very ready and indeed is "grown up" to where it is ready for another film in this genre. * * *. The record does not show whether or not filming of this sequel was ever commenced. Several settlement offers to resolve the lawsuit between HGS and Heritage have been made by Steloff and Heritage, but they have been unacceptable to the other litigants. During the late 1970's and early 1980's, increases in interest rates caused further financial problems for Heritage due to loans advanced to Heritage. In order to survive *460 financially, Heritage retained for its own use and failed to report the receipt of income to several groups of film owners whose films Heritage was distributing. During the time it was trying to exploit "The Young Warlord" commercially, between 1977 and 1984, Heritage had entered into 18 agreements with other parties to exploit the film commercially in South Africa, South America, Latin America, Spain, France, Belgium, Israel, Australia, New Zealand, Hong Kong, Nigeria, Canada, Italy, Scandinavia, and Lebanon. These agreements were the result of package deals in which Heritage licensed the rights to a number of films in a single package. The figures for any resulting income attributable to "The Young Warlord," as set forth below, represent only Steloff's allocation, based on his best guess as to the amount that should be allocated to that motion picture, as part of a package of several films. [11]
*461 For the period January 1, 1977 through September 30, 1984, HGS, according to Steloff's best guess, should have received, but did not receive, approximately the following revenue on account of the film (including proceeds from videocassette licensing) from Heritage: Domestic Gross:
$ 42,330.13
Less: Distribution Fee:
10,582.53
$ 31,747.60
Foreign Gross:
$ 54,061.14
Less: Distribution Fee:
10,812.22
$ 43,248.92
Total due HGS
$ 74,996.52
Out of the $ 74,996.52, Heritage would be entitled to retain $ 24,998.83 (one-third) as partial repayment of the $ 58,333 purportedly advanced to Ramwell, Inc. on behalf of HGS at the closing (on November 22, 1974) of the purchase of the film. Additionally, as of September 1985, Heritage was owed some other monies which it had not received from exploitation of "The Young Warlord." See n.11, supra. Of that amount, HGS would be entitled to some $ 6,611.62 (which presumably will be reduced by approximately $ 2,204 to reflect additional repayment of Heritage's purported advance to Ramwell, Inc. on behalf of HGS). Although HGS obtained the right to quarterly reports from Heritage and the right to *462 audit the Heritage books, HGS has never enforced these rights nor attempted such an audit. At the end of 1984 the nonrecourse liabilities between Heritage and Ramwell, Inc. and between Ramwell, Inc. and HGS were extended for another 10 years. No principal or interest payments had been made on either note for the initial 10 years. HGS' note for $ 1,400,000 (principal and interest) and Ramwell, Inc.'s note for $ 625,000 (principal only) were extended for another 10 years pursuant to the terms of the original Sales and Distribution Agreements. [12] The recited consideration was $ 1 and the extension of time within which the debt might be paid from revenues generated by the film. Heritage continued to be the sole, exclusive and irrevocable distributor of "The Young Warlord." *463 For the years before the Court, 1974 through 1980, HGS on its partnership tax returns reported gross receipts and claimed depreciation deductions as follows: Reported
Depreciation
Year
Gross Receipts
Deduction Claimed
1974
None     $  24,929
1975
$ 40,906 [13]
292,020
1976
None     208,586
1977
2,211    148,990
1978
1,500    106,421
1979
None     76,015
1980
None     54,297
Total
$ 44,617    $ 911,258
HGS, for the years 1974 through 1980, claimed ordinary losses on its partnership tax returns in the following amounts: 1974
$  24,929
1975
261,340
1976
208,586
1977
147,332
1978
104,921
1979
76,015
1980
54,297
*464 The following table shows the after-tax gains (but for the instant case) made by the respective petitioners as a result of the distributive share of HGS' losses claimed by the respective petitioners: Tax Saving
Resulting from
Investment
Petitioners
Cash Investment
in HGS
Difference
David M. & Joan Green
$ 11,667
$ 50,000
$ 38,333
Samuel & Tillie Moritz
11,667
56,522
44,855
Horace J. & Edith K.
Waldman [14]
11,667
53,134
41,467
Estate of Burton S.
Brooks, deceased,
Anita C. Brooks,
Executrix & Anita
C. Brooks
3,887
7,466
3,579
Anita Mandel [15]
-- 827
827
Michael & Anita
Mandel [16]
-- 809
809 *465 Green determined that HGS would depreciate the film pursuant to the double-declining-balance method, and HGS' depreciation deductions were calculated according to that method. The HGS partners also claimed investment tax credits, computed on a purchase price of $ 1,047,000 for "The Young Warlord." OPINION In this case petitioners formed a partnership to invest in a motion picture entitled "The Young Warlord." They paid for rights to exploit the film in the United States and in certain foreign countries. The recited purchase price for the motion picture was $ 1,047,000, some $ 172,000 payable in cash and the balance, $ 875,000, in the form of a nonrecourse note payable solely out of exploitation proceeds. See n.24, infra. The motion picture met with very little success -- far too little income was earned to pay off any of the nonrecourse liability of the partnership. Petitioners, however, claimed large depreciation deductions and investment tax credits, which they utilized to lower their Federal taxes that otherwise would have been owing upon their substantial income from other sources. Respondent has challenged these deductions, claiming that the motion picture investment *466 was a sham because it lacked economic substance. Respondent further claims that the deductions should be limited to the amount of gross income earned by the motion picture because the partnership failed to establish that the investment in the motion picture was made with the requisite profit objective required by section 183. Respondent also attacks the basis and method of computing the depreciation deductions and investment tax credits reported by the partnership and claimed by the partners on their individual returns. This case presents another in a long series of cases in which a partnership or individual has invested in a motion picture that has met with little success but has generated large claimed tax benefits for the investors. We have allowed these tax benefits, as appropriate, when the investments have been shown to be valid profit-oriented ventures. See, e.g., Taube v. Commissioner, 88 T.C. 464 (1987); Wildman v. Commissioner, 78 T.C. 943 (1982). When, however, the investment is not a profit-seeking activity, but rather one where large nonrecourse liabilities have been used to generate only tax benefits, we have had little difficulty *467 in sustaining the disallowance of the tax benefits claimed. See, e.g., Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). [17]
Profit Objective
Respondent's profit-objective argument, if accepted, would be largely dispositive of the case before us. We will therefore first address the issue whether the purchase and attempted exploitation of "The Young Warlord" were activities not engaged in for profit within the meaning of section 183. [18]
*468 Whether an activity is engaged in for profit turns on whether the taxpayer entered into or carried on the activity with an actual and honest objective of making a profit. Elliott v. Commissioner, 90 T.C. 960 (1988); Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). [19] Whether an activity carried on by a partnership is carried on with the requisite profit objective is determined at the partnership level. Brannen v. Commissioner, supra, 78 T.C. at 502-505. As this Court has previously stated, section 183 is not a disallowance provision, but rather allows a taxpayer to deduct certain expenses that he could not otherwise deduct. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), *469 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner , 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984); Brannen v. Commissioner, supra, 78 T.C. at 500. If an activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). Depreciation deductions are allowable under section 183(b)(2). Sec. 1.183-1(b)(1)(iii), Income Tax Regs.
During the years before the Court, petitioners' HGS partnership reported no income from the movie for 1974, 1976, 1979, and 1980. *470 For 1975, HGS reported $ 40,906; [20] for 1977, some $ 2,211; and for 1978, $ 1,500. If we find the motion picture investment was an activity not engaged in for profit, the claimed depreciation deductions will be allowable as a deduction under section 183 up to those amounts. Sec. 1.183-1(b)(1)(iii), Income Tax Regs. We also note, however, that section 183 speaks only in terms of the allowance of deductions. It is clear that no investment tax credit is allowable for property used in an activity not engaged in for profit. See secs. 48(a), 167 and 183(c); Hagler v. Commissioner, 86 T.C. 598, 622 (1986), affd. without published opinion sub nom. Dahlmeier v. Commissioner, 822 F.2d 63 (11th Cir. 1987). [21]
*471 The term "profit" in the context of section 183 means economic profit, independent of tax savings. Soriano v. Commissioner, 90 T.C. 44, 54 (1988); Herrick v. Commissioner, 85 T.C. 237 (1985); Surloff v. Commissioner, 81 T.C. 210 (1983). Petitioners thus must establish that their partnership entered into the motion picture business with an actual and honest profit objective. Fox v. Commissioner, supra, 80 T.C. at 1006; Dreicer v. Commissioner, supra, 78 T.C. at 644-645. While a reasonable expectation of profit is not required, the partnership must have had an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, supra, 78 T.C. at 644-645; Allen v. Commissioner, 72 T.C. 28, 33 (1979); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The issue is one of fact to be resolved on the basis of all the surrounding *472 circumstances. Beck v. Commissioner, supra, 85 T.C. at 570; Flowers v. Commissioner, supra, 80 T.C. at 931-932; Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioners have the burden of proving the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra; Flowers v. Commissioner, supra; Golanty v. Commissioner, supra, 72 T.C. at 426. In making this factual determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra; Flowers v. Commissioner, supra; Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Churchman v. Commissioner, 68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., lists some nine of the relevant factors to be considered in determining whether an activity is engaged in for profit. [22] However, all nine factors do not necessarily apply in every *473 case, and those that do not apply need not be discussed where no purpose would be served. See, e.g., Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Our cases provide other examples of relevant factors. See, e.g., Flowers v. Commissioner , supra, 80 T.C. at 937; Estate of Baron v. Commissioner, 83 T.C. 542, 558-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986), where we noted that a highly inflated nonrecourse note can contribute to a determination of a lack of a profit objective with respect to the property securing the note. *474 In this case we find very little indication that the HGS partnership had an actual and honest objective of earning a profit from the investment in and exploitation of "The Young Warlord." Most importantly, the HGS partnership, although composed of lawyers and accountants, did not conduct the partnership in a businesslike manner. Initially the partnership failed to determine whether it had obtained proper title to the motion picture so that it could exploit the picture in the United States market. The television series on which the motion picture was based and the movie itself were the product of a joint venture between Steloff's company, Heritage, and other British and German entities. That fact alone should have put the partners on notice that they had to be certain that they had obtained the rights to exploit the motion picture from the proper party, yet they did not undertake to make that determination. They relied instead only on vague assurances of Wellbrock and Steloff that the movie was theirs to sell. Actually the movie was first sold by Heritage to Wellbrock's company, Ramwell, Inc. The record is singularly devoid of information as to the terms of that sales agreement *475 between Heritage and Ramwell, Inc. The HGS partnership's rights to "The Young Warlord" would be limited to whatever rights Ramwell, Inc. itself had acquired from Heritage and had available to sell. The partners should also have ascertained whether they had a valid copyright to the film, for their ownership of a valid copyright was necessary for the successful exploitation of the film. Durkin v. Commissioner, 87 T.C. 1329, 1368-1369 (1986), affd. 872 F.2d 1271 (7th Cir. 1989). [23] Again they failed to do so. The record does not establish that HGS ever obtained a copyright to the film. Nor did they obtain any independent appraisals of the value of the motion picture before they bought it. They relied only on the assurances of its value from Steloff, who needed money and was obviously interested in attracting investors in the picture. Steloff admittedly was "hustling a deal" and was engaged in sales puffery. The only appraisals petitioners received were received a couple of days after they had already signed the sales contract for the film; these so-called appraisals were so sketchy and uninformative as to be virtually meaningless. No reasonable person *476 could have relied on these so-called appraisals. The HGS partnership also failed to substantiate whether the makers of the film had in fact incurred the production costs of some $ 1,100,000 that might provide some indication of the maker's investment in the film and perhaps provide some indication to the investors of the film's value. Siegel v. Commissioner, supra, 78 T.C. at 687-688. Again, the HGS partners only took the promoter's word as to the costs to make the movie. Moreover, a reasonable investigation of the economic viability of the motion picture would have informed the HGS partnership that a film shot in 16-millimeter film was not commercially acceptable in the American market, where the state of the art was to produce motion pictures shot in 35-millimeter. Indeed, further investigation of the status of their proposed investment by the partners would likely have revealed, as their own expert testified, that the motion picture would have yielded them far less in domestic revenues than the ostensible price that they "paid" for the motion picture. The "expertise" of the HGS partners *477 or their advisors does not support a finding of any profit objective. None of the partners knew anything about motion pictures. Only Horowitz viewed the film before the sale, and he admitted he was not qualified to make a determination as to its value. His purported advisor and friend, Bud Fillipo, did not testify at the trial, and the failure to call him as a witness was never explained. It was at least obvious to the HGS partners that the only way they could hope to obtain a profit from exploitation of the motion picture was by having it successfully distributed in the United States and in foreign markets. Yet they blindly entered into a distribution contract with Heritage, based upon the prepackaged arrangements for the investment. They had no right under that distribution contract to change distributors. Heritage was the sole, exclusive and irrevocable distributor. In effect Steloff continued to effectively control "his film" despite its purported sale first to Ramwell, Inc. and then from Ramwell, Inc. to HGS. The HGS partners failed to investigate whether Heritage had ever distributed a picture that had been profitable for its owners. They did not seek to discover what *478 was necessary to carry out such a distribution, or whether Heritage had the assets or the know-how to engage in such a distribution. As Steloff candidly admitted, Heritage was in bad financial condition and could not undertake such a distribution during the time required -- but the partners failed to ascertain that fact before they invested and bound themselves to Heritage as the sole distributor. There is no indication that anyone connected with the partnership sufficiently investigated the picture or its prospects so as to support a reasonable expectation or indeed any expectation that the film could be distributed successfully. Horowitz testified that because of Steloff's representations "the dollar bills were floating around in front of our eyes" and that some unidentified "friends in the industry" checked Steloff out and told Horowitz "to shoot crap with [Steloff] because you will be rolling in bushels of money." The Court disregards this purported reliance on Steloff and the purported advice of unidentified friends as more of Horowitz' own self-serving puffery. In any event, at the very least, Horowitz' testimony shows that the HGS partners failed to make any reasonable *479 investigation before purchasing the film. These partners were lawyers and accountants, not unsophisticated, unschooled individuals unaccustomed to the business world. The explanation for their failure to investigate is that they were impelled by the tax benefits of the transaction, not by any actual and honest objective of making an economic profit. Indeed, the record clearly reveals that there was inadequate preparation for distribution of the film. There was not enough time for a successful completion in terms of editing and promotion of the motion picture between the time of the partnership's investment, November 22, 1974, and the December release date of the motion picture required by the distribution agreement. Again the tax imperative of having the film placed in service by the end of the year overrode reasonable business considerations. See n.25, infra. There was nothing indicating either in 1974 or later that the picture would appreciate in value. The letter from Steloff to Horowitz in 1983, promoting an investment in "The Young Warlord, Part II," indicated that in 1974 the market was not then ready for "a costumer," meaning, apparently, the first "The Young Warlord. *480 " Nor does the record indicate that any market ever developed for "The Young Warlord" or any sequel. None of the partners showed any success in similar fields. We are inclined to give little weight to the testimony of Horowitz that he made "some dollars" successfully putting on some rock concerts. And while the income of petitioners from their accounting business shows success in the dissimilar field of accounting, we do not think that such success indicates that they were striving for similar economic success in the motion picture business. Their success in obtaining handsome incomes from their accounting business instead suggests that they were looking for tax shelter from the film. The only direct impact that any of the partners had on the operations of the HGS partnership was in the tax area; petitioner Green selected the double-declining-balance method of depreciation and prepared the tax returns which reflected the substantial tax benefits claimed as a result of that method of depreciation. In terms of actual income and profits from the operation, the motion picture had an unrelieved record of losses. Even the amounts gleaned from Steloff's 18 contracts for foreign exploitation *481 of the film failed to yield any amounts of income approaching the amounts needed to repay the nonrecourse note. At most only $ 74,996.52 was earned over about an eight-year period. The financial status of the partners is revealing. Notwithstanding the failure of the film to earn any money, the tax benefits generated, as set forth in the Findings of Fact above, show that the partners received in tax benefits far more than the cash that they invested. The ratio of nonrecourse notes to cash invested was about 7 to 1 in this case. The ratio of large tax benefits to minimal cash invested is a further indication that the HGS partnership did not have an actual and honest objective of making a profit from exploitation of the motion picture. The total cash invested was, even using petitioners' figures, at most only some $ 172,000, and the partnership claimed depreciation deductions of over $ 911,000 plus investment tax credits based on a purported $ 1,047,000 purchase price. On paper, of course, the HGS partnership was liable for a much greater amount, the $ 875,000 nonrecourse note. There was also the nonrecourse obligation for the $ 58,333 Heritage purportedly loaned to the partners *482 as part of their putative $ 172,000 cash down payment. [24] In this case, however, there was no obligation or incentive for the partners to pay the notes out of any funds other than those received from exploitation of the movie. As a practical matter, the partners could and did simply ignore the nonrecourse notes; in fact, they extended the notes for another 10 years. In similar situations, our conclusion that a transaction was not entered into for profit has been buttressed by the presence of large amounts of debt that would be payable only if highly speculative properties happened to gain public acceptance and make large amounts of money. See Estate of Baron v. Commissioner, supra, 83 T.C. at 553; Flowers v. Commissioner, supra, 80 T.C. at 937. *483 Finally, notions of personal pleasure are not significant to our holding. We do note that Horowitz, who concededly knew nothing about the motion picture business, selected "The Young Warlord" for the partnership in part because he liked it better than the animal film he was shown as an alternative investment. We are not persuaded by petitioners' insistence that the partnership's negotiations with Wellbrock and Steloff were at arm's length. We especially do not accept the notion that hard bargaining was necessary to get Steloff and Wellbrock to agree to take back nonrecourse financing. The sale between Heritage and Wellbrock's corporation, Ramwell, Inc., was based on a large, nonrecourse note, and the amount of the nonrecourse financing was simply increased in the sale from Ramwell, Inc. to HGS. Wellbrock, in fact, had provided a prospectus to Green indicating that nonrecourse financing was the proper way for the partnership to invest in the motion picture in order to gain the anticipated tax benefits. Moreover, Green and the other HGS partners were too sophisticated as lawyers and accountants to put themselves economically at risk against the dicey and unexplored possibilities *484 that "The Young Warlord" could ever generate $ 3 million in revenues, which was required to enable them to pay off the nonrecourse notes, let alone to make any profit on their investment. Nor are we impressed with the subsequent attempts of the partnership to show that Horowitz supposedly attempted to badger Steloff into further promotional efforts, or supposedly attempted to promote the film himself. These supposed attempts do not show that the partnership was after a profit from its investment. The HGS partnership had bound itself by the distribution agreement with Heritage as shown by the fact that Steloff vetoed the deal Horowitz or Tone supposedly made with the Brazilian group. Under their agreement with Heritage, the HGS partners could not change distributors. Based upon the foregoing, we conclude that the HGS partnership did not invest in the motion picture with an actual and honest objective of making a profit. Accordingly, we conclude that the amount of any deductions that the partnership may claim is limited to the amount of partnership gross income generated by the motion picture. Furthermore, as discussed above, we hold that the partnership is not entitled to claim *485 any investment tax credits. [25]
*486 Inclusion of Nonrecourse Indebtedness in Basis
To the limited extent that we allow petitioners to claim depreciation deductions in this case, their deductions are limited to the amount of their basis in the movie. See sec. 167(g). Section 167(g) provides that the basis for depreciable property is the adjusted basis provided in section 1011. Section 1011 provides that in determining the gain or loss from the sale or other disposition of property, the basis of such property, as provided in section 1012, is its cost. Where the property is acquired by purchase, generally the basis includes the amount of liabilities assumed (or the property taken subject to such liabilities) by the purchaser. Crane v. Commissioner, 331 U.S. 1 (1947); Parker v. Delaney, 186 F.2d 455 (1st Cir. 1950); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949). The mere fact that the liability is secured only by the asset transferred and the purchaser otherwise has no personal liability will not, in and of itself, prevent such liability from being included in the basis of property. Mayerson v. Commissioner, 47 T.C. 340 (1966). *487 It is well settled, however, that depreciation is based not on mere legal title, but on actual investment in the property. Narver v. Commissioner, 75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Accordingly, we will not include in basis a purported nonrecourse liability if it lacks economic substance or is too contingent to be treated as valid debt for tax purposes. In determining whether a purported nonrecourse liability lacks economic substance or is too contingent or speculative to be treated as valid debt for Federal tax purposes, the courts have used various approaches. One line of cases looks at the fair market value of the property in relation to the stated purchase price or the principal amount of the indebtedness. This line of cases treats a nonrecourse obligation as a valid debt only if the acquired property reasonably secures payment of the obligation. Where the nonrecourse obligation is not adequately secured, a purchaser would acquire no equity in the property and therefore would have no economic incentive to pay the note. Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. *488 64 T.C. 752 (1975); see also Waddell v. Commissioner, supra; Odend'hal v. Commissioner, 80 T.C. 588, 604-605 (1983), affd. 748 F.2d 908 (4th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 773-774 (1981); Narver v. Commissioner, supra, 75 T.C. at 98-100; Beck v. Commissioner, 74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982). The other major approach holds that an obligation, even if recourse, will not be treated as a true debt where payment, according to its terms, is too contingent or speculative. See Denver & Rio Grande Western R.R. Co. v. United States, 505 F.2d 1266 (Ct. Cl. 1974) (obligation payable at rate of 32 percent of carload freight traffic revenue after movement of 100,000 net tons per year); Lemery v. Commissioner, 52 T.C. 367 (1969), affd. per curiam on another issue 451 F.2d 173 (9th Cir. 1971) (obligation contingent upon business sold showing net profit); Columbus & Greenville Railway Co. v. Commissioner, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966), *489 cert. denied 385 U.S. 827 (1966) (obligation to pay based on mileage of railroad lines); Albany Car Wheel Co. v. Commissioner, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964) (obligation for severance pay -- incurred as part of acquisition of assets of predecessor corporation -- contingent upon failure to give employees notice prior to closing plant). This "contingent obligation" approach has been applied recently in tax shelter cases involving nonrecourse loans where the principal was payable out of exploitation proceeds. See, e.g., CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982), affg. in relevant part, revg. and remanding on other grounds Brountas v. Commissioner, 73 T.C. 491 (1979) (payment of note contingent upon discovery of recoverable amounts of oil or gas); Brountas v. Commissioner, 692 F.2d 152 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979) (same); Gibson Products Co. v. United States, 637 F.2d 1041 (5th Cir. 1981) (same); Estate of Baron v. Commissioner, supra, 83 T.C. at 550-553 *490 (note payable solely out of proceeds of record sales); Fox v. Commissioner, supra, 80 T.C. at 1022-1023 (note payable solely out of book sale proceeds); Saviano v. Commissioner, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985) (note payable solely out of sales proceeds of mined gold); Graf v. Commissioner, 80 T.C. 944 (1983) (note payable solely out of profits from foreign dredging operation). The contingent liability theory is in many ways complementary to Estate of Franklin's reasonable security approach. Fox v. Commissioner, supra, 80 T.C. at 1020. As we said in Waddell v. Commissioner, supra, 86 T.C. at 902, both theories represent efforts by the courts to validate from objective criteria the assumption upon which a valid nonrecourse debt (for tax purposes) is predicated -- the assumption that the obligation will be paid. A nonrecourse debt will be recognized for tax purposes only if it appears likely from all the facts and circumstances that the obligation will be paid. The HGS partnership's nonrecourse promissory note to Ramwell, Inc. for $ 875,000 and *491 its nonrecourse liability to Heritage for $ 58,333 must be tested under these principles. If we cannot conclude at the outset of the transaction that payment of the nonrecourse note or other nonrecourse liability is likely, then the note or other liability is too contingent or speculative to be recognized for tax purposes. On this record we cannot find that the $ 875,000 nonrecourse note or the other nonrecourse liability of $ 58,333 was adequately secured. Indeed the record is barren of any persuasive testimony or other probative evidence showing that "The Young Warlord" was worth at least the amount of the nonrecourse indebtedness. Petitioners initially offered the testimony of Steloff himself as an "expert," but we discount his testimony. Steloff made the film; he needed money and was interested in selling it to others and in doing what he could to inflate the film's value. His testimony could scarcely be called objective. [26]Steloff's testimony that the motion picture was worth "several million dollars" is also belied by his own actions and those of his company, Heritage. He sold the motion picture to Ramwell, Inc. for $ 125,000 in cash and a $ 675,000 nonrecourse note. *492 No payments were ever made on that note. When at the end of the 10-year period the note due to Heritage was not paid off, Steloff (or Heritage) could have reacquired the motion picture from Ramwell, Inc. Instead, for the recited payment of $ 1, he extended the note due from Ramwell, Inc. for another 10 years. In turn, Ramwell, Inc. extended the note due from the HGS partnership for another 10 years. Petitioners' other expert, Ralph E. Donnelly, did not aid their cause. Mr. Donnelly was in charge of acquiring motion pictures for exhibition at a major New York motion picture chain, and, previously, he had national experience as head film buyer for RKO Stanley Warner Theaters. He prepared a written report which was so skimpy and lacking in detail as to be virtually useless. He testified that the motion picture "The Young Warlord" was "timeless" as a "period piece"; it did not date itself because of changed automobile models, *493 or changing fashions. He conceded, however, that period pieces generally did not do well unless they featured actors with high name recognition. Mr. Donnelly approved of the acting job of the lead in the film, Oliver Tobias, but he stated that he could not find that actor's name in his reference books. He stated that the film was "very interesting, and very well made," and that it had a "rich looking feel." But he further stated that the film was "choppy" and the "editing was bad," likely because the film had "three different directors and two different script writers." He stated that reediting might improve the film, or might make it worse. He estimated that the picture would earn $ 1 million in gross box office receipts, to be split between the distributor and the exhibitors (theaters). His report estimated that the picture would earn the distributor some $ 500,000 in "domestic United States" net theatrical revenues. That figure was based on gross box office receipts of $ 1,000,000. But then, assuming what he thought to be a reasonable 75/25 percent distribution deal between the producer (film owner) and distributor, he estimated that the gross receipts to the producer of *494 the picture (that is, to the HGS partnership) would be $ 375,000, or 75 percent of the distribution receipts. Petitioners' own expert's figures, therefore, indicate that domestic exploitation of the film could generate only approximately one-third the revenues needed to recover the cost (production costs or HGS's purchase price) of the film. The United States domestic market usually includes the United States and Canada and that market represents about 50 to 60 percent of the world market for movies. Mr. Donnelly's report, however, was apparently limited to just the United States. Respondent offered the testimony of William A. Madden, who had been a vice president in charge of distribution of Metro-Goldwyn-Mayer, and, upon retirement, a consultant and teacher of motion picture economics at the University of California at Los Angeles. Madden is an expert with a long and distinguished career in the distribution of motion pictures. Madden testified that the actual motion picture appears too episodic; the picture is so fragmented and confusing that it fails to be an entertaining motion picture. [27] He observed that the names of the producer, director, and cast of the motion picture *495 are unknown to the average moviegoer and theater exhibitor and would not mean very much to them in terms of marketing the film. He also noted that the motion picture was filmed originally in 16-millimeter film. Almost all theaters in the United States, however, show 35-millimeter movies only. Because the film was blown up from 16 millimeters to 35 millimeters, the movie was "very grainy" and "the color was faded." Madden explained that theater owners do not like to show films that are blown up from 16 to 35 millimeter because when you blow up the picture for the large screen, it becomes very grainy and the picture loses definition. To Madden, the motion picture had "abrupt jumps," shifting from one scene to another as if reels were missing. He concluded that "The Young Warlord" was a poorly made film. Madden further testified that theater exhibitors will not usually take a picture without a properly prepared advertising campaign. *496 Madden went on to describe the economics of film distribution. He stated that the general rule in the motion picture industry is that one must take in film rentals of 2-1/2 to 3 times the negative cost or production cost of making the picture in order to break even. Film rentals are that share of the box office receipts that the theater owner remits to the distributor. Here, Madden explained, the HGS partnership would need film rentals of approximately $ 3.3 million to recover the alleged $ 1,100,000 cost of making the picture or their putative $ 1,047,000 purchase price of the film. Another general rule in the movie industry, Madden testified, is that in order for a producer (film owner) to achieve a particular film rental, the box office receipts -- that is the amount taken in by the exhibitor -- received at the theaters must be approximately two and one-half times the targeted film rentals. Therefore, in order to achieve the targeted $ 3.3 million film rentals, the movie here would have to gross at the box office some $ 8 million dollars. In order to achieve this amount of revenue in gross box office receipts and film rentals, this film would have had to achieve the status, *497 in 1974, of what is called a "box office champ." To Madden, this picture, "The Young Warlord," could never have achieved the necessary box office receipts or film rentals necessary to achieve such a status because the picture was not well made, was not entertaining, and did not have the necessary production qualities. Madden further testified that Heritage, known as a small television marketing company, did not have the necessary clout or established relationships in the industry to distribute a picture. Madden concluded that, because the film could not cover its expenses, it had "no theatrical value." Respondent also offered the testimony of Woodrow Sherrill, another former officer of Metro-Goldwyn-Mayer, who had left to work in motion picture distribution on his own. Sherrill's testimony, like Madden's, concluded that the picture has no theatrical value because the cost of advertising and distribution would exceed the film rentals that could be received; Sherrill explained that the distribution value of a picture is important in determining the motion picture's worth, since it is through the distribution of a picture that its cost is recouped and any profit is made. Sherrill *498 estimated that, under the terms of the distribution contract between HGS and Heritage, in order for HGS to recoup the acquisition price paid for the motion picture, the picture would have to earn $ 12,960,000 in box office receipts. For the year of release, 1974, that would have made the picture one of the top 50 pictures of the year. The picture, Sherrill concluded, did not have the necessary qualities to do that kind of business. [28]
Petitioners attack the conclusion of Madden and Sherrill, arguing that their zero-value analysis ignores the foreign *499 income receipts to be gained from exploitation of the film. We do not think that petitioners' argument avails them much. The record establishes that Steloff did an assiduous job of lining up worldwide exploitation of the motion picture. Nevertheless, his 18 foreign contracts yielded only some $ 50,000 in potential revenue to the HGS partnership in an eight-year period (assuming, of course, that Heritage can ever find its way clear to pay over the amounts it purportedly owes to HGS). Petitioners have not established that the motion picture could earn any more than it did under the agreement with Heritage and with Steloff's efforts. We think that substantial foreign earnings were unlikely. The picture is an English-language production, featuring a story of English folklore and mythology. It seems that the foreign market for such a film is, by virtue of its subject matter and language, rather limited. Yet, other than domestic United States consumption, the only major English-speaking areas where the picture might have been exploited were Australia, South Africa, and New Zealand. The HGS partnership did not have the rights to exploit the film in the United Kingdom and Eire. Steloff *500 negotiated a number of contracts in Australia and New Zealand, apparently without any economic success. In any event, the domestic market (United States and Canada) represents 50 to 60 percent of the world market for movies. Respondent also offered the testimony of Robert M. Newgard, formerly with Paramount Pictures as vice president of worldwide sales. Newgard testified that in 1974 the picture had a potential television value of $ 35,000 to $ 40,000. Moreover, to Newgard,"The Young Warlord" was "a very nice little picture" but "the story jerks around" and is confusing. The movie appeared to be confusing because "it was a television series and it was hooked together" to make a motion picture. Petitioners urge that Newgard did not properly account for a "second cycle" release of the motion picture for television and, further, that Newgard did not give proper account for the cable television market. Those arguments do not dissuade us from accepting Newgard's views. He testified that, as the deal was originally structured, the HGS partnership initially might not have held the picture long enough to guarantee it the right to sell for an anticipated "second cycle," and that cable *501 television, in 1974, was still in its infancy. On balance, we conclude that there is nothing in the way of expert testimony, nor in the actual performance of the film, that would indicate that "The Young Warlord" had anything approaching the economic value needed to pay off the $ 875,000 nonrecourse note it secured for the HGS partnership. Moreover, the nature of the movie investment shows that the possible repayment of this nonrecourse indebtedness was too contingent to support its inclusion in the partnership's basis. The nonrecourse promissory note for $ 875,000 given by the HGS partnership to Ramwell, Inc. was payable only out of 50 percent of HGS' earnings from the motion picture after the first $ 175,000. Generally, when debt principal is paid solely out of exploitation proceeds, nonrecourse loans are contingent or speculative obligations and are not treated as true debt. Durkin v. Commissioner, supra, 87 T.C. at 1376; Estate of Baron v. Commissioner, supra, 83 T.C. at 550-553. Once we have determined that the HGS partnership had an interest only in the exploitation receipts from the motion picture, one which was subject to a highly *502 speculative acceptance by the general public, we must conclude that the nonrecourse debt does not reflect an actual investment in property, that it cannot be included in the taxpayers' depreciable basis, and that it must be disregarded for tax purposes unless and until paid. We reach the same conclusion as to the $ 58,333 nonrecourse obligation purportedly owed to Heritage. [29] See nn.8, 24, supra. Accordingly, because the value of the motion picture was insufficient to pay off the nonrecourse note and the other nonrecourse obligations and because payment of the nonrecourse note and other nonrecourse obligations was too contingent and speculative, we conclude that the nonrecourse note and other nonrecourse obligations are not properly included in the HGS partnership's basis. In view of our conclusion, petitioners' basis is limited to the amount of cash invested *503 in the film by the partnership. This would be $ 116,667 ($ 50,000 + $ 33,333 + $ 33,334). Method of Depreciation
In this case the HGS partnership used the double-declining-balance method of calculating depreciation. Respondent changed the double- declining-balance method of calculating depreciation on the picture to the "income-forecast" method. Under section 446(b), respondent has "broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." Commissioner v. Hansen, 360 U.S. 446, 467 (1959). Respondent's authority under section 446(b) reaches not only overall methods of accounting, but also a taxpayer's method of accounting for specific items of income and expense. Sec. 1.446-1(a), Income Tax Regs.; Keller v. Commissioner, 725 F.2d 1173, 1179 (8th Cir. 1984), affg. 79 T.C. 7 (1982); Grynbera v. Commissioner, 83 T.C. 255, 267 (1984); Primo Pants Co. v. Commissioner, 78 T.C. 705, 721 (1982). This Court cannot interfere with respondent's adjustments to a method of accounting under section 446(b) unless the adjustments are "clearly unlawful" or "plainly arbitrary. *504 " Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979). Section 167(b) of the Code provides that the term "reasonable allowance" for depreciation shall include an allowance computed under the straight-line method, the declining-balance method at a rate not exceeding twice the straight-line rate, the sum-of-the-years-digits method, or any other method that does not, during the first two- thirds of the useful life of the property, produce total allowances that exceed the amount that would have been allowable under the declining-balance method. In the present case the double-declining-balance method utilized by the partnership resulted in the reported basis of the property, its stated cost of $ 1,047,000, being multiplied by a fraction, the numerator of which was two and the denominator of which was seven, representing a seven-year life for the property. For the first year this computation yielded an amount of $ 299,142. Petitioners claimed as depreciation one-twelfth of that amount in 1974, or $ 24,929, apparently reflecting the fact that they had held the property for only one full month during that year. In the second year petitioners multiplied their *505 new adjusted basis of $ 1,022,071 times the two-sevenths fraction to yield an annual deduction of $ 292,020 for 1975. The process continued throughout the years in issue. In Revenue Ruling 60-358, 1960-2 C.B. 68, as amplified by Revenue Ruling 64-273, 1964-2 C.B. 62, respondent determined that methods of computing depreciation described in section 167(b) of the Code are in most cases inadequate when applied to motion picture films and similar properties because such methods result in a distortion of income. Revenue Ruling 60-358 states that the usefulness of such assets in the taxpayer's trade or business is measurable over the income it produces and cannot be adequately measured by the passage of time alone. Therefore, in order to avoid distortion of income, depreciation must follow "the flow of income." The Revenue Ruling holds that the income-forecast method of depreciation is an acceptable method for computing a reasonable allowance for depreciation on such property. The "income-forecast" method requires the application of a fraction, the numerator of which is the actual income from the film for the taxable year and the denominator of *506 which is the forecasted or estimated total income to be derived from the film during its useful life. In this case an application of the "income-forecast" method would result in either no depreciation deduction or very little depreciation deduction because of the meager earnings of the film. In this case petitioners have failed to establish that the respondent's long-standing use of the income-forecast method produces a result that is either clearly unlawful or plainly arbitrary. Accordingly, we sustain respondent's adjustments requiring computation of depreciation under the income-forecast method to the extent that such deductions are otherwise allowable. Increased Interest Under Section 6621 Respondent's amendment to answer asserted additional interest on substantial underpayments attributable to tax motivated transactions, pursuant to section 6621(c).[30] The increased interest provided by section 6621(c) is to be determined where respondent establishes that there is a "substantial underpayment" (an underpayment exceeding $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Tax motivated transactions include, in addition to those enumerated *507 in section 6621(c)(3)(A), those which may be specified in regulations prescribed by the Secretary. Sec. 6621(c)(3)(B). Section 301.6621-2T A-4(1), Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), includes as "deductions * * * attributable to tax motivated transactions" the following: Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit * * *. Section 301.6621-2T A-10, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), provides that the increased interest rate applies to interest accruing under that provision after December 31, 1984, regardless of the date prescribed for payment of the tax. This same provision states that a taxpayer may stop the running of the increased interest by posting a bond or cash payment in the amount of the *508 tax liability and interest already accrued. Sec. 301.6621-2T A-11, Temp. Proced. & Admin. Regs. We have held that the partnership's activities in investing in "The Young Warlord" were not entered into with an actual and honest objective of making a profit as required by section 183. As a result, there are underpayments attributable to deductions claimed by petitioners in excess of the amounts permitted by section 183. Under the explicit terms of section 6621(c) and its accompanying regulations relating to tax motivated transactions, these underpayments, to the extent they exceed $ 1,000, constitute "substantial underpayments." The imposition of interest on substantial underpayments as proposed by respondent is therefore sustained. [31] See Ewing v. Commissioner, 91 T.C. 396, 422-423 (1988); Soriano v. Commissioner, supra, 90 T.C. at 62. *509 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded the addition to tax under section 6651(a) for petitioners Estate of Burton S. Brooks and Anita C. Brooks. Anita Mandel (formerly Anita C. Brooks) concedes the adjustment for taxes in the amount of $ 219 for her 1978 taxable year. Petitioners Horace J. and Edith K. Waldman concede the adjustment for Caddo Productions.↩
3. Burton R. Horowitz, although not a petitioner in this case, took an active part in the proceedings, and agreed that the outcome of this litigation will be determinative of the outcome of his own tax liabilities as they relate to the HGS partnership. An agreement to be bound has been filed in his case, docket No. 16362-83. Edward N. Schwartz and his spouse were originally parties to this suit but settled their case before trial; an order was issued, severing them from this case and assigning them a separate docket number (docket No. 36726-84).↩
4. Wellbrock testified that Ramwell, Inc. paid $ 875,000 for the movie, but at the time the HGS partnership acquired the movie, Wellbrock had supplied Green with a letter confirming that Ramwell, Inc. had paid $ 750,000. We accept the earlier written document as being more trustworthy than Wellbrock's memory many years later. ↩
5. Both Steloff and Wellbrock failed to produce the sales contract and other documents, although subpoenaed to do so; their explanations for such failure were unsatisfactory. Wellbrock, for example, suggested to the Court that he had not retained a copy of his $ 625,000 nonrecourse note since he "owed" the money.↩
6. Horowitz testified that, during the time he was considering whether to invest in "The Young Warlord," he was advised by one Bud Fillipo, who was allegedly knowledgeable about the film business. Fillipo, however, did not testify at the trial of this case, and there is no probative evidence as to his supposed expertise. The Court discounts much of Horowitz' testimony as so much self-serving puffery. The Court's evaluation of his testimony was reached by the Court's own observation of the witness, particularly on direct examination, and was not based on the fact that he is a disbarred lawyer, a fact later brought out on cross-examination and a fact much overemphasized in respondent's briefs.↩
7. The investors later formed HGS Productions as a New Jersey general partnership on November 22, 1974. The partners were Horowitz, who had a 50-percent share of partnership profits and losses; Schwartz, who had a 16-2/3-percent share of profits and losses; Moritz, Waldman, and Green, who each had a 10-percent share; and Burton S. Brooks, who had a 3-1/3-percent share.↩
8. Green was the bookkeeper who kept the books for HGS. At the trial of this case, he could not say whether or not Heritage actually made a cash payment of $ 58,333 to Ramwell, Inc. The Court is troubled by what appears to be a lot of circular movements of phantom cash, none of which is documented in the record. Ramwell, Inc. had just bought the film from Heritage for $ 125,000 in cash and a $ 625,000 nonrecourse note; there is no persuasive or probative evidence to establish that that $ 125,000 cash was ever paid to Heritage. Petitioners seem to argue that Wellbrock was just a broker flipping over the film for what amounted to a $ 50,000 broker's commission, presumably HGS's actual cash contribution. Steloff (or Heritage) needed help in the form of dollars, yet supposedly was lending $ 58,333 to HGS on a nonrecourse basis as part of HGS's supposed cash down payment. In the absence of documentation of the type that reasonable businessmen would normally maintain in the ordinary course of business to substantiate such cash payments, the Court is unwilling to assume that any such payments (the $ 125,000 and the $ 58,333) were actually made and concludes that there were phantom cash "payments" in this transaction.↩
9. While Horowitz testified that these guarantees were intended as inducements to Steloff (or Heritage) to vigorously promote the film, this would hardly accomplish that goal. Heritage and Steloff were in need of dollars, and lack of funds is what caused their actual promotion efforts in 1974 to be so ineffectual. The Court is satisfied that the sole, exclusive and irrevocable nature of the distribution rights was the real reason for any such guarantees. Steloff was determined to retain control over the distribution of this film and to avoid a repetition of his earlier experience where one of his films got away from him and beyond his control. As indicated in the text below, petitioners subsequently loaned the money back to Heritage after it had purportedly paid part of the "guarantee."↩
10. Although Heritage and HGS apparently contemplated some revision and further editing of the film both before and after the 1974 release, the record does not indicate the nature or scope of that process, nor are there any documents or other probative evidence establishing the cost of such further editing and/or extra filming.↩
11. The Court accords little weight to these figures or to Steloff's "best guess," particularly in view of the pending litigation between HGS and Heritage that they were trying to settle at the time of this trial. These figures were generated in the course of or shortly after the trial of this case and were submitted to this Court by a supplemental stipulation and without further live testimony by Steloff. Steloff's affidavit reciting that "Heritage will pay HGS Productions the money it owes" is accorded little weight by this Court.↩
12. While Horowitz testified that he would not permit the film to be lost (to HGS), the Court regards his testimony as so much self-serving puffery. The Court is satisfied the HGS partners never had any intention of paying this $ 1,400,000 principal and interest by December 31, 1984, nor any intention of paying that or any other amount by December 31, 1994, except out of exploitation proceeds. When and if such proceeds are realized and payments are actually made on the note, HGS will then acquire some additional equity and basis in "The Young Warlord" beyond the investors' cash-out-of-pocket payments.↩
13. There appears to be a discrepancy between the gross receipts reported in 1975 by HGS and the producer's report provided HGS by Heritage. The record does contain a copy of a check from Heritage to HGS dated March 10, 1975, in the amount of $ 384.57. Assuming HGS reported the guarantee by Heritage of $ 30,295 in 1975, that would add up to gross receipts of $ 30,679.57 for 1975. It is unclear how HGS arrived at the $ 40,906 figure.↩
14. For the years 1975, 1976, 1977, and 1978, some other items were disallowed by respondent with respect to petitioners Waldman. See n.2, supra↩. The above figures do not reflect disallowances other than those relating to HGS. We have assumed that the Waldmans were in the 50-percent bracket. 15. Tax benefit flowed from the cash payment of Estate of Burton S. Brooks, etc. The $ 827 tax deficiency also includes an adjustment for taxes in the amount of $ 219. See n.2, supra↩. 16. See n.15, supra↩.
17. See also Akelis v. Commissioner, T.C. Memo. 1989-182; Estate of Canfield v. Commissioner, T.C. Memo. 1987-294; Jaros v. Commissioner, T.C. Memo. 1985-31; Burpee v. Commissioner, T.C. Memo. 1983-710↩.
18. Section 183, in relevant part, provides: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.↩
19. See also Marshall v. Commissioner, T.C. Memo. 1988-524; Zane v. Commissioner, T.C. Memo. 1988-392; Jenkins v. Commissioner, T.C. Memo. 1988-292↩.
20. Respondent notes that this amount may include the $ 30,295 "guarantee" of Heritage to HGS, an amount which the partners then loaned back to Heritage in 1975 to keep it afloat. Although we are somewhat skeptical of this transaction, on this record, we see no basis for reducing the reported income by the "guarantee" amount. With respect to the other amounts that Heritage received but which were not reported or paid over to HGS, we believe that the financial status of Heritage was too precarious for those amounts to be deemed "income" to the HGS partnership. Also the record does not show exactly when Heritage received this $ 74,996.52, other than the period from January 1, 1977 through September 30, 1984. We do not accept Steloff's allocation of the amount (see n.11, supra↩), and there is no basis in the record for allocating any portion of the amount to the years before this Court. 21. See also Kaehn v. Commissioner, T.C. Memo. 1987-608; Williams v. Commissioner, T.C. Memo. 1987-308; Massengill v. Commissioner, T.C. Memo. 1986-159↩.
22. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.↩
23. See Burpee v. Commissioner, T.C. Memo. 1983-710↩.
24. Wellbrock testified he received $ 175,000 in cash, but that clearly was incorrect. The purchase price was reduced to $ 1,047,000 and the nonrecourse note was $ 875,000, so at most only $ 172,000 was paid in cash. The HGS partners paid only $ 50,000 in cash and had no information as to whether or not Heritage actually advanced any money on their behalf. See n.8, supra↩. On this record, the Court is not persuaded that Heritage made any such $ 58,333 payment. As will be discussed in the text below, we conclude that petitioners in fact only paid cash totaling $ 116,667.
25. Because of our holding as to the lack of profit objective, we need not consider whether the investment credits were otherwise properly claimed. We note, however, that notwithstanding petitioners' claims, there is nothing in the record that establishes that this motion picture qualified for investment tax credits under section 48(k). Initially, we note that it is settled that section 48(k) applies to the years in issue and is not unconstitutional. Fife v. Commissioner, 82 T.C. 1 (1984). Moreover, there is nothing in this record to establish that the production costs of the motion picture were in fact United States production costs. See sec. 48(k)(5). In fact, we are satisfied that the production costs were not United States production costs. Additionally, we seriously doubt that the limited release of the motion picture in 1974 would have qualified as placing the motion picture in service in that year. See Isenberg v. Commissioner, T.C. Memo. 1987-269. After that limited initial release, the motion picture was withdrawn from distribution for further editing and post-production work. On brief petitioners even argue that the videocassette of the film which all of the experts and the Court viewed (see n.27, infra↩) did not represent what would be shown in a theater. Petitioners argue that "the version shown in the theatres or on television would be a better edited final version than [the Court exhibit]." This suggests, if anything, that work still remains before this movie would be ready for theatrical distribution.
26. See Estate of Canfield v. Commissioner, T.C. Memo. 1987-294↩. Also, at the time of the trial of this case, there was a lawsuit pending between Heritage and the HGS partnership, which the partners and Steloff were trying to settle.
27. Petitioners offered into evidence a videocassette of the movie, the same one viewed by all of the experts in the case, and asked the Court to view the film. The Court has done so, and agrees with Madden's assessment. While the cast was excellent, these fine English actors were given little to do in this movie. The movie consisted of a string of disjointed episodes and battle scenes. There was little plot or character development. From its "jury view," the Court noted that, despite the grainy quality of the film, the handsome leading man, Oliver Tobias, and the costumes were pleasing to the eye.↩
28. We note that in estimating a break-even point, Madden appeared to allow Heritage a 40 percent share of the box office receipts, or some $ 3.2 million ($ 8 million X 40 percent). Sherrill indicated that, in the motion picture industry, independent distributors generally receive only 25 percent of the actual box office receipts from the theater owners. The reason is that independent distributors have a difficult time getting theater owners to play their pictures. Thus, $ 12.96 million in box office receipts would be needed to yield film rentals to Heritage of $ 3.24 million, approximately the same net figure derived by Madden.↩
29. To the extent, if any, that the $ 74,000 that Heritage has apparently failed to pay over to the HGS partnership can be properly charged against this nonrecourse $ 58,333 debt or against the $ 875,000 nonrecourse note, the partners may well acquire additional basis when and if this money is ever paid to HGS.↩
30. The additional interest was originally asserted under section 6621(d), which was redesignated section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. All such references made herein are to the redesignated section.↩
31. The section 183 profit-objective issue has been involved in this case from the outset, well before respondent's amendment to answer asserting increased interest under section 6621. The imposition of the addition to tax under section 6621 flows from our resolution of the section 183 issue. Therefore, we need not consider a valuation overstatement under section 6659(c) to support this increased interest rate.↩