T.C. Memo. 2012-231


UNITED STATES TAX COURT


CHRISTOPHER W. JOHNSON, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CHRISTOPHER W. JOHNSON, JR., AND JILL S. JOHNSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17467-09, 24586-09.          Filed August 9, 2012.


<u>A. Brian Phillips</u> and <u>Joshua E. Bills</u>, for petitioners.

<u>Randall B. Childs</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARIS, <u>Judge</u>:  On April 23, 2009, respondent issued a notice of deficiency

for tax year 2003 to petitioner Christopher W. Johnson, Jr.  On July 14, 2009,

respondent issued a notice of deficiency for tax years 2004 and 2005 to petitioners

[*2] Christopher W. Johnson, Jr., and Jill S. Johnson.  The notices determined the following deficiencies in petitioners' Federal income tax, additions to tax under section 6651(a)(1), and penalties under section 6662(a):[1]

| Petitioner(s) | Year | Deficiency | Addition to tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|---|---|---|---|---|
| Christopher W. Johnson, Jr. | 2003 | $53,049 | $13,262.29 | $10,609.80 |
| Christopher W. Johnson, Jr. & Jill S. Johnson | 2004 | 47,224 | 12,497.50 | 9,444.80 |
| Christopher W. Johnson, Jr. & Jill S. Johnson | 2005 | 32,225 | 5,281.24 | 6,445.00 |

The issues for decision are:  (1) whether petitioners engaged in a drag racing venture during tax years 2003, 2004, and 2005 with the expectation of making a profit; (2) whether, if the activity was engaged in for profit, petitioners are entitled to deduct drag racing expenses of $186,282, $221,671, and $154,335 for tax years 2003, 2004, and 2005, respectively; (3) whether petitioners are liable for the addition to tax for failure to timely file Federal income tax returns under section 6651(a)(1) for tax years 2003, 2004, and 2005; and (4) whether petitioners are

---

[1]All section references are to the Internal Revenue Code in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*3] liable for the accuracy-related penalty under section 6662(a) for tax years 2003, 2004, and 2005.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits received in evidence are incorporated herein by this reference. Petitioners resided in Florida when the petitions were filed.

I. Background

Between 1996 and 2003 petitioner Christopher W. Johnson, Jr. (Mr. Johnson), was employed by Lucent Technologies and a subsequent spinoff company, Avaya, as a data network remote field engineer. Mr. Johnson serviced large corporate and governmental clients' telecommunications accounts. In 2001 Mr. Johnson became involved with two other partners, David Posea and Gerald Wroblewski, in a business venture to develop and market performance computer chips for automobiles. Mr. Johnson's primary role in this venture was to contribute to the development of the intellectual property that went into the automotive performance products. In addition, Mr. Johnson contributed by testing and debugging the company's products and engaging in marketing activities. In 2003 this venture was officially organized and registered as Zoom Chips, LLC

**[*4]** (Zoom Chips), a Florida limited liability company.  Mr. Johnson served as the managing member of Zoom Chips.

By the time Zoom Chips was officially organized, the intellectual property it developed had become very valuable.  Later in 2003 a company known as Superchips made an offer to purchase the assets of Zoom Chips, which Mr. Johnson and the other members accepted.  This sale resulted in income to Mr. Johnson of approximately $700,000.[2]

As part of the sale agreement, Mr. Johnson, Mr. Posea, and Mr. Wroblewski formed a new company known as Superchips Custom Tuning, LLC (SCT).  SCT was organized as a Florida limited liability company in late 2003 to design, manufacture, and produce both hardware and software used for the customization of automobiles.  In this venture Mr. Johnson did not retain his status as the managing member.

The members of SCT continued developing the intellectual property they had developed previously as Zoom Chips, but they did so in conjunction with Superchips.  Zoom Chips ceased operations in late 2003 and thereafter existed only as an entity through which to distribute the proceeds of the reorganization.

---

[2]This amount was paid to Mr. Johnson in monthly installments spread out over tax years 2003 and 2004.

[*5] SCT was owned and operated by Mr. Johnson and the other members until 2007, when its assets were sold to a private equity group for a substantial sum.

II. CJ Racing

As far back as the early 1990s, Mr. Johnson regularly engaged in competitive automobile drag racing on a recreational level. In 2003, outside of his involvement with Zoom Chips and SCT, Mr. Johnson began operating an automobile drag racing venture known as Chris Johnson Racing (CJ Racing). All of the expenses associated with CJ Racing were paid out of the private accounts of petitioners. Mr. Johnson did not open separate banking or credit accounts for this activity, nor did he create a formal business plan. CJ Racing was not incorporated under the laws of any State and had no official relation to any of Mr. Johnson's other business ventures.

For most of his involvement with CJ Racing, Mr. Johnson operated the racing activity from a facility in Irvington, Alabama. The facility was located near Mobile International Dragway and consisted of two structures: a large automobile shop and a smaller building used for office and storage space. Within the automobile shop Mr. Johnson regularly engaged in automotive performance work,

[*6] including the fabrication and tuning of customer vehicles[3] and Mr. Johnson's race car.[4]

During the years at issue CJ Racing regularly participated in professional drag race events. Mr. Johnson devoted, on average, approximately 20-50 hours per week to his racing activity. This time included extensive preparation of his race car for competition, travel to and from his operating facilities,[5] travel to and from racing events in Alabama and Mississippi, and participation in racing events. Mr. Johnson's preparation for these race events routinely involved automobile

---

[3]It is unclear who these customers were. Mr. Johnson and his witnesses testified that he had been working on several cars on the premises. However, no explanation was offered as to who the customers were, what he was doing for them, whether he was being compensated for these services, and for what entity he was acting while servicing these cars. The timeline of events represented by Mr. Johnson and his supporting witnesses suggests that these vehicles were present before he established JMS Chip and Performance, LLC, discussed below. In addition, there is no evidence in the record that Mr. Johnson reported income to himself or any of his associated entities from services rendered to these customers.

[4]Mr. Johnson's primary vehicle was a 1991 Ford Mustang that was subject to several mechanical modifications and a full engine replacement during its use in CJ Racing. It appears that Mr. Johnson already owned this vehicle before forming CJ Racing, but it is unclear when it was originally purchased and for what use. In September 2004 Mr. Johnson replaced this vehicle with a 2005 Ford Mustang, discussed below.

[5]Mr. Johnson lived in Florida for all of the years at issue. Mr. Johnson admits that his estimates of the hours he devoted to CJ Racing included those spent commuting long distance between Florida, Alabama, and Mississippi.

[*7] maintenance and repair, automotive fabrication, and extensive performance tuning. At the events themselves Mr. Johnson was the primary driver of the vehicle until he was injured in a racing accident on September 19, 2004. After the accident, Mr. Johnson ceased driving race cars in competition and used other drivers[6] to participate in races on behalf of CJ Racing.[7]

Despite Mr. Johnson's efforts, CJ Racing never earned a profit. During tax year 2003 the activity earned only $1,500 of income from race winnings.[8] During tax years 2004 and 2005 CJ Racing had no income from race winnings. The only income petitioners reported for CJ Racing for tax years 2004 and 2005 was from the sale of T-shirts and other miscellaneous items of $2,318 and $3,154, respectively. Mr. Johnson attempted to procure sponsorships from various

---

[6]Mr. Johnson testified that he made agreements with these drivers that any winnings from CJ Racing would be split. However, no winnings were generated during the remainder of CJ Racing's operation.

[7]In addition, Mr. Johnson's 1991 Ford Mustang was destroyed in this accident. Consequently, Mr. Johnson purchased a 2005 Ford Mustang to use as the new race car for CJ Racing.

[8]It is also of note that for tax year 2003 Mr. Johnson claims to have spent $1,500 in entry fees to racing events. Therefore, CJ Racing's winnings were barely enough to cover the mere entry fees of racing, much less any expenses beyond that.

[*8] automotive companies but was largely unsuccessful, failing to secure any sponsorship that resulted in cash income to CJ Racing.[9]

III. Transition to JMS Chip and Performance, LLC

In the spring of 2005 Mr. Johnson and a partner, Monty Johnson,[10] started a separate business venture to provide custom computer tuning, perform vehicle modifications, and build race cars for a client base of amateur and professional racers.[11] This venture was organized as JMS Chip and Performance, LLC (JMS), a Nevada limited liability company. For its first few months of existence JMS was operated from Mr. Johnson's automotive facility in Irvington, Alabama.

In early August 2005 Mr. Johnson discontinued use of the automotive facility in Irvington, Alabama, and moved to a new facility in Lucedale,

---

[9]Mr. Johnson did testify that he received support from several minor sponsors in the form of products and services. In the sponsorship proposal he circulated, Mr. Johnson lists the following companies as sponsors of CJ Racing: TCI, SCT, JDM Engineering, Gunn RaceCraft, Wilson Manifolds, Pro Engine, Ford Performance Solutions, Perry's Auto, Paul's Auto, Wynn Speed, Mustang Dyno, and other private individuals. Despite this extensive list Mr. Johnson did not report any income from sponsorships, either in cash or as barter income for the products and services he allegedly received from these sponsors.

[10]Monty Johnson is not related to Christopher W. Johnson, Jr.

[11]A third member, Tim Roy, was also involved, but his interest in the company was later sold.

[*9] Mississippi.[12]  Concurrently with the move, Mr. Johnson decided to end CJ Racing and use the new facility to bring JMS into full operation.  Although it ceased operations,[13] Mr. Johnson transported all of the records relating to CJ Racing to a storage room at the new facility in Lucedale.

On August 29, 2005, Hurricane Katrina made landfall in New Orleans, Louisiana, and proceeded into southern Mississippi, causing severe flooding and property destruction.  Mr. Johnson's facility in Lucedale, Mississippi, was in the general path of Hurricane Katrina and sustained substantial damage.  As a result the storage room at the Lucedale facility was destroyed along with all of the records relating to CJ Racing.

IV.  Schedule C Reporting

Petitioners did not file timely Federal income tax returns for tax years 2003, 2004, and 2005.  Petitioners' returns for the years at issue were due on April 15,

---

[12]Mr. Johnson asserts that, because of a right-of-way dispute with the State of Alabama, he was forced to move from the Irvington location.

[13]Despite CJ Racing's ceasing operations in favor of the newly formed LLC, JMS Chip and Performance, petitioners still claimed several extraneous items as deductions on Schedule C, Profit or Loss From Business, of their 2005 Federal income tax return for amounts paid between September 2005 and December 2005.

[*10] 2004, April 15, 2005, and April 17, 2006,[14] respectively. However, petitioners actually filed their returns for the years at issue on June 16 and December 7, 2006, and August 17, 2007, respectively.

Petitioners reported income and loss from CJ Racing on Schedules C of their Federal income tax returns.[15] For tax years 2003, 2004, and 2005, petitioners reported expenses of $186,282, $221,672, and $154,335, respectively. After netting the meager income reported on behalf of CJ Racing, petitioners claimed Schedule C losses for CJ Racing of $184,782, $219,353, and $151,181 for tax years 2003, 2004, and 2005, respectively. Petitioners used these losses to offset substantial income received from Mr. Johnson's other ventures, resulting in a significant reduction of their tax liability for the years at issue.

On April 23, 2009, respondent issued to Mr. Johnson a notice of deficiency for tax year 2003. On July 14, 2009, respondent issued to both petitioners a notice of deficiency for tax years 2004 and 2005. On July 21, 2009, Mr. Johnson timely

---

[14]April 15, 2006, fell on a Saturday so petitioners' return for that year was due on Monday, April 17, 2006.

[15]Only the transactions of CJ Racing would be considered appropriate to report on a Schedule C. The rest of Mr. Johnson's entities (Zoom Chips, SCT, and JMS) were organized as multiple-member limited liability companies, the transactions of which would have been more appropriately reported on their corresponding Schedules K, Partner's Distributive Share Items, of their partnership returns.

**[*11]** filed a petition in this Court for review of the notice of deficiency for tax year 2003.  On October 16, 2009, both petitioners timely filed a petition in this Court for review of the notice of deficiency for tax years 2004 and 2005.  A motion to consolidate the two cases under Rule 141 was granted on March 29, 2010.

OPINION

I.  Burden of Proof

The Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving that the determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Taxpayers also bear the burden of proving that they are entitled to any deductions claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Taxpayers must maintain sufficient records to establish the amounts of allowable deductions and to enable the Commissioner to determine the taxpayers' correct tax liabilities.  See sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999); sec. 1.6001-1(a), Income Tax Regs.

**[\*12]** Section 7491(a) provides an exception that can shift the burden of proof to the Commissioner. The burden to disprove a claimed deduction shifts to the Commissioner if the taxpayer introduces credible evidence regarding relevant factual issues and has: (1) complied with all relevant substantiation requirements; (2) complied with all relevant recordkeeping requirements; and (3) has cooperated with reasonable requests by the Commissioner for meetings, interviews, witnesses, documents, and information. Sec. 7491(a)(1) and (2)(A) and (B). Credible evidence is evidence that, after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted. Higbee v. Commissioner, 116 T.C. 438, 442 (2001). A taxpayer who provides only self-serving testimony and inconclusive documentation has been held not to have provided credible evidence. See id. at 445-446; Blodgett v. Commissioner, T.C. Memo. 2003-212, aff'd, 394 F.3d 1030 (8th Cir. 2005).

At trial petitioners[16] failed to produce any primary records in relation to CJ Racing for the tax years at issue. Instead, petitioners produced secondary materials in the form of bank and credit card statements in an attempt to substantiate the deductions claimed on their return. Petitioners contend that

---

[16]While both petitioners, Christopher and Jill Johnson, were represented by legal counsel, only Christopher Johnson participated in the trial. Jill Johnson chose not to attend.

[*13] because the loss of primary documentation was due to the extensive damage caused by Hurricane Katrina, and because they attempted to reconstruct those records from secondary sources, they should be deemed to have met the requirements of section 7491(a).[17]  The Court disagrees.  While petitioners made an effort to reconstruct their expenses from secondary records, those records were incomplete and inconclusive.  Said records were only bolstered and supplemented by the self-serving testimony of Mr. Johnson.  While the Court finds some of this evidence to be credible, petitioners have not made a sufficient showing to shift the burden of proof to respondent under section 7491(a).  Accordingly, petitioners retain the burden of proving that respondent's determinations are in error.

## II.  Section 183

Under section 183(a), if an activity is not engaged in for profit, then no deduction attributable to that activity is allowed except to the extent provided by

---

[17]It is also of note that petitioners filed their Federal income tax returns in this case for tax years 2003, 2004, and 2005, on June 19 and December 7, 2006, and August 17, 2007, respectively.  The Court takes notice that Hurricane Katrina made landfall in Louisiana on or about August 29, 2005, and had moved north through Tennessee as a tropical depression on or about August 30, 2005.  Petitioners thus filed their tax returns for the years at issue at least 10 months after Hurricane Katrina destroyed their records.  Therefore, petitioners constructed and filed Federal income tax returns that were not only substantially late but claimed rather aggressive deductions and loss figures, without having any of the primary records to aid in substantiation.

**[*14]** section 183(b). In pertinent part, section 183(b) allows those deductions that would have been allowable had the activity been engaged in for profit only to the extent of gross income derived from the activity, reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit.

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 or under section 212(1) or (2) if the taxpayer is engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer need not, however, establish that his or her expectation of profit was reasonable. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.

The existence of the requisite profit objective is a question of fact that must be decided on the basis of all of the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), aff'd without published opinion, 782 F.2d 1027 (3d Cir. 1986); sec. 1.183-2(b), Income Tax Regs. In resolving this

[*15] factual question, greater weight is given to objective facts than to a taxpayer's statement of intent. See Elliott v. Commissioner, 84 T.C. at 236; sec. 1.183-2(a), Income Tax Regs.

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. These factors are not exclusive, and no single factor is determinative. Id.

A. Manner of Carrying On the Activity

The first factor to consider is the manner in which petitioners carried on CJ Racing. The fact that the taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Similarly,

**[\*16]** where an activity is carried on in a manner substantially similar to other profitable activities of the same nature, a profit motive may be indicated. Id. A change of operation methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Id. A taxpayer should use some cost accounting techniques that, at a minimum, provide the entrepreneur with the information required to make informed business decisions. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), aff'g T.C. Memo. 1985-523. Without such a basis for decisions affecting the enterprise, the incidence of a profit in any period would be wholly fortuitous, and losses would be expected. Id.

The Court has held that a lack of profit motive is indicated where a taxpayer fails to create a business plan or formal budget, fails to estimate income and practice cost control, and fails to maintain a separate bank account for the activity. Smith v. Commissioner, T.C. Memo. 2007-368, aff'd, 364 Fed. Appx. 317 (9th Cir. 2009). Specific to the field of drag racing, the Court has also held that a lack of a bona fide profit objective is indicated where the taxpayer fails to procure a substantial sponsorship for his racing endeavor. Kraettli v. Commissioner, T.C. Memo. 1988-413.

[*17] At trial petitioners did not introduce any evidence to show that they ever maintained complete and accurate books or created a formal budget for CJ Racing either before or after the hurricane. There is similarly no evidence to suggest that petitioners took any measures to implement any accounting controls or operation methods that would be consistent with an intent to increase profitability. Petitioners admitted that they never formulated an actual business plan for CJ Racing. Additionally, it is clear that petitioners did not maintain a separate bank or credit account for CJ Racing.

Petitioners contend that Mr. Johnson conducted CJ Racing in a manner similar to his other profitable businesses and that this indicates that the activity was engaged in for profit. However, petitioners' position is dependent on the notion that Mr. Johnson's other profitable ventures were "of the same nature" as CJ Racing. While Mr. Johnson's other ventures were tangentially related to automobile performance, they were engaged in a fundamentally different manner of business practice. Accordingly those enterprises cannot be considered to be "of the same nature" as CJ Racing.

It is also of note that in the course of conducting CJ Racing, petitioners were unable to secure any significant sponsorships. While Mr. Johnson claims

[*18] that several companies provided him with free car parts and intellectual property, his failure to procure any substantial sponsorships during the operation of CJ Racing does not help to establish that petitioners had a bona fide profit objective.

Petitioners have failed to show that they carried on CJ Racing in a manner which indicates that it was engaged in for profit. This factor weighs against petitioners.

B. Expertise

The next factor to consider is the expertise of Mr. Johnson and his advisers. Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. With respect to auto racing, a distinction must be drawn between expertise in the mechanics of an activity and expertise in the business, economic, and scientific practices relating to its conduct. Burger v. Commissioner, 809 F.2d at 359; Zidar v. Commissioner, T.C. Memo. 2001-200. Failure to consult with persons who have made a profit in auto racing or to inquire as to how to make a profit in such a

**[*19]** venture indicates a lack of a bona fide profit objective. Emerson v. Commissioner, T.C. Memo. 2000-137.

Mr. Johnson has established that he is extremely knowledgeable in the fields of automobile mechanics, software and hardware design, and performance enhancement. Mr. Johnson also has some amateur experience with racing automobiles and is familiar with many aspects of race car design, development, and mechanics. However, these realms of expertise relate to the mechanics of the underlying activity being performed by the company. None of these fields assist in the business or economic practices that would improve the profitability of a racing operation.

It is true that Mr. Johnson has been engaged in a number of businesses throughout his career that have been successful in the design and sale of various automotive performance devices. However, this too does not suggest the requisite expertise for the venture at hand. The companies with which Mr. Johnson was involved before CJ Racing were businesses that manufactured and tested products and sold them to various clients. Racing is a vastly different business model in which the racing teams depend on sponsorships, marketing, merchandising, and winnings. Mr. Johnson's acumen in retail sales would not, and indeed did not, do him much good in a racing enterprise.

**[\*20]** Petitioners contend that Mr. Johnson not only relied on his own expertise in pursuing this activity, but also consulted with other persons whose expertise should be considered. Mr. Johnson names several people with whom he spoke in regard to his racing endeavor. However, Mr. Johnson has not shown that any of the people he consulted with had run profitable racing teams. Further, Mr. Johnson has not shown that, in any of these consultations, he sought advice on how to run a profitable racing team as opposed to advice on the mechanics and development of the cars themselves.

It seems discordant for Mr. Johnson to claim to have such extensive and well-suited expertise and yet generate only a few thousand dollars a year in gross revenue from CJ Racing. Mr. Johnson and his associates may indeed have extensive expertise in the field of automobile performance devices, but he has failed to demonstrate that he or any of his advisers possessed any knowledge of the profitability of auto racing, a vastly different enterprise. This factor weighs against petitioners.

C. Time and Effort Expended

The third factor to consider is the time and effort expended by the taxpayer in carrying on the activity. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have

[*21] substantial personal or recreational aspects, may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. Id. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. Id.

Mr. Johnson testified that he worked 20-50 hours per week with CJ Racing. Combined with his full-time employment at SCT in 2004 and 2005, this means that he was working 80-100 hours per week total. Granting petitioners this fact, it is of little indicative value given the recreational nature of the racing business. Further, Mr. Johnson's admitted propensity for amateur racing shows that he has devoted substantial portions of his past free time to racing without a profit motive.

During the years at issue Mr. Johnson did not consciously scale back his hours at SCT to devote more time to CJ Racing. Mr. Johnson also did not hire any employees to assist with day to day operations at CJ Racing. Accordingly, neither of these indicia of a profit motive is applicable in this case.

**[\*22]** Petitioners have shown that Mr. Johnson devoted significant time and effort to CJ Racing, however the recreational nature of the activity undermines this point. This factor does not weigh either for or against petitioners.

### D. Expectation of Appreciation

The fourth factor to consider is the expectation that the assets used in the activity may appreciate in value. The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Sec. 1.183-2(b)(4), Income Tax Regs. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit is derived from current operations, an overall profit will result when appreciation in the value of the asset used in the activity is realized since income from the activity together with the appreciation of the asset will exceed expenses of operation. Id.

Petitioners contend that there was an expectation for the assets used in CJ Racing to appreciate because the intellectual property used in the automobile performance software, chips, and hardware would increase in value and result in a profit to them. However, the future profitability of automobile performance equipment developed in the process of fielding a racing team is, at best, only tangentially related to the purpose of the racing team. In fact, such profit expectation would be more befitting of one of the automotive performance

[*23] companies in which Mr. Johnson was engaged, and any product developed and sold in that arena and merely tested in his race cars would be irrelevant to this inquiry.

The primary asset of CJ Racing was the race car used by Mr. Johnson. Mr. Johnson admitted at trial that he did not expect the race car to appreciate in value. Accordingly, this factor weighs against petitioners.

E. Success in Other Activities

The fifth factor to consider is the success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.

Here, Mr. Johnson has been successful in businesses that, while not entirely similar, were tangentially related to CJ Racing. Mr. Johnson's past successes in the realm of automotive performance may indeed have led him to believe that he could field a profitable auto racing team. This factor weighs in favor of petitioners.

[*24] F. <u>History of Income or Losses</u>

The sixth factor to consider is the taxpayer's history of income or losses with respect to the activity in question. A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. <u>Id.</u> A record of substantial losses combined with a remote chance of achieving a profitable operation are important factors bearing on a taxpayer's intent to make a profit. <u>Schlafer v. Commissioner</u>, T.C. Memo. 1990-66.

During the years at issue petitioners reported expenses from CJ Racing of $186,282, $221,672, and $154,335, respectively. In those same years, petitioners reported revenues from CJ Racing of only $1,500, $2,318, and $3,154, respectively. The disparity in these amounts resulted in substantial losses in all three years at issue.

It is certainly true that the initial investment in a racing team would be a significant one. The expenses associated with an investment of such magnitude

**[*25]** would likely require some time to recoup. However, petitioners have not shown that they made any effort to increase the profitability of the activity in any meaningful way.

Given petitioners' record of substantial losses, with minimal effort to right this imbalance, there is no indication that they had a bona fide profit objective. This factor weighs against petitioners.

G.  Amount of Profit

The seventh factor to consider is the amount of occasional profits, if any, which are earned in the course of conducting the activity. Profit is generally defined as receipts in excess of costs. See Portland Golf Club v. Commissioner, 497 U.S. 154, 166 (1990). The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made large investment, would not generally be determinative that the activity is engaged in for profit. Id. However, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate

**[\*26]** that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Id.

In Emerson v. Commissioner, T.C. Memo. 2000-137, the taxpayer was engaged in an automobile drag racing activity. The taxpayer incurred substantial expenses that far exceeded the small cash awards that he received as revenue for the years at issue. Id. The Court stated that "the small cash awards petitioner received were miniscule in relation to both the losses he incurred and his total investment in the activity, and without a sponsor, petitioner never had an opportunity to earn a substantial ultimate profit." Id. Accordingly, the Court held this factor in favor of the Commissioner. Id.

Like the taxpayer in Emerson, petitioners generated only small cash revenues of a few thousand dollars for each year at issue. During that time petitioners incurred large losses as a result of the disparity between their miniscule revenues and substantial expenses. While Mr. Johnson boosted revenues slightly in 2004 and 2005 by selling shirts, this does little to show that the racing operation could have been made any more profitable. In those same years, Mr. Johnson did not have any income from winning races, and during the entire three years at issue he secured no significant sponsorships. As in Emerson, the Court finds that the

[*27] occasional profits, both realized and potential, do not indicate a profit motive. This factor weighs against petitioners.

### H. Petitioners' Financial Status

The eighth factor to consider is the financial status of the taxpayer. The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved. Id.

Petitioners reported expenses from CJ Racing of $186,282, $221,672, and $154,335 for tax years 2003, 2004, and 2005, respectively. Petitioners reported revenue from CJ Racing of only $1,500, $2,318, and $3,154, respectively.[18] As a

---

[18]It is of note that in calculating revenue for CJ Racing, petitioners failed to report any amount of barter income received through products and services that Mr. Johnson claimed to have obtained through minor sponsorships. Gross income includes the fair market value of property or services received in exchange for other services. Sec. 61(a); sec. 1.61-2(d)(1), Income Tax Regs. If petitioners were receiving auto parts and services as the result of sponsorship agreements entered into by Mr. Johnson, they should have been reporting the fair market value of those goods and services as Schedule C income to CJ Racing. Had petitioners properly reported such income it would have decreased their Schedule C losses for the years at issue.

**[*28]** result petitioners claimed Schedule C losses of $184,782, $219,353, and $151,181 for tax years 2003, 2004, and 2005, respectively.

For the tax years at issue petitioners had significant income from sources other than CJ Racing. The losses claimed in relation to CJ Racing had the effect of reducing petitioners' taxable income from $318,161 to $97,593 for tax year 2003, from $475,656 to $256,303 for tax year 2004, and from $196,012 to $44,831 for tax year 2005. The claimed offset of these losses would have conveyed substantial tax benefits to petitioners for the years at issue. Further, as discussed below, the nature of the activity is such that it involved elements of recreation which Mr. Johnson found pleasurable.

Accordingly, the Court finds that the financial status of petitioners does not indicate a profit motive. This factor weighs against petitioners.

I. Personal Pleasure or Recreation

The final factor that should be considered is whether the activity in question involves personal pleasure or recreation. The presence of personal motives in the carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs.

**[\*29]** Mr. Johnson argues that while automobile racing is typically engaged in for amusement or as a hobby, the hours of work and preparation that go into a race were not enjoyable. However, it is clear from Mr. Johnson's testimony, as well as the other witnesses at trial, that Mr. Johnson derived significant recreational enjoyment and personal pleasure from automobile drag racing. Mr. Johnson has spent several years and untold amounts of money involved with automobile drag racing, with little financial return. It is difficult to believe that Mr. Johnson would engage in such behavior without deriving any recreational benefit.

The Court finds that the personal and recreational nature of the activity do not indicate a profit motive. This factor weighs against petitioners.

On the basis of the record and considering the nine factors discussed above, the Court finds that petitioners did not engage in CJ Racing for profit. Accordingly, petitioners are not allowed to deduct expenses under Schedule C associated with this activity for tax years 2003, 2004, and 2005. Gross receipts relating to this activity should be classified as other income, and deductions will be limited to the amount of those receipts.

III. Section 6651(a)(1) Addition to Tax

Failure to file a tax return on the date prescribed leads to a mandatory addition to tax unless the taxpayer shows that such failure was due to reasonable

[*30] cause and not due to willful neglect. Sec. 6651(a)(1). For each month the return is late, an addition to tax equal to 5% of the amount of tax required to be shown on the return shall be assessed, not exceeding 25% of the aggregate. Id. Under section 7491(c), the Commissioner has the burden of production to show that the imposition of an addition to tax under section 6651(a)(1) is appropriate. Respondent has met this burden by presenting evidence that petitioners failed to timely file their Federal income tax returns.

The burden of proving reasonable cause and lack of willful neglect falls on the taxpayer. Rule 142(a); United States v. Boyle, 469 U.S. 241, 249 (1985). Reasonable cause exists where a return is late despite the taxpayer's exercising "ordinary business care and prudence." Sec. 301.6651-1(c), Proced. & Admin. Regs. Circumstances that are considered to constitute reasonable cause are typically those outside of the taxpayer's control, for example: (1) unavoidable postal delays; (2) timely filing of a return with the wrong office; (3) death or serious illness of the taxpayer or a member of the taxpayer's immediate family; (4) taxpayer's unavoidable absence from the United States; (5) destruction by casualty of taxpayer's records or place of business; and (6) reliance on the erroneous advice of an Internal Revenue Service officer or employee. McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997), aff'g T.C. Memo. 1995-547.

[*31] Mr. Johnson filed his 2003 tax return late, on June 19, 2006. Petitioners filed their tax returns for 2004 and 2005 late, on December 7, 2006, and August 17, 2007, respectively. Petitioners contend that they had reasonable cause to file their tax returns late because their records were destroyed by Hurricane Katrina. The Court finds Mr. Johnson's testimony credible; however, Hurricane Katrina did not make landfall until late August of 2005. For tax years 2003 and 2004 the returns were already late by the time Hurricane Katrina would have destroyed petitioners' records. Accordingly, petitioners are liable for the additions to tax under section 6651(a)(1) for tax years 2003 and 2004.

With respect to tax year 2005 the Court finds petitioners' argument more persuasive. After the complete destruction of their records in late August, petitioners could not be expected to file their 2005 tax return on time, especially considering the volume of data to be reconstructed. The Court holds that petitioners' failure to timely file their 2005 return was due to reasonable cause and not due to wilful neglect. Accordingly, petitioners are not liable for the addition to tax determined under section 6651(a)(1) for tax year 2005.

IV. Section 6662(a) Penalty

Section 6662 imposes an accuracy-related penalty equal to 20% of the underpayment attributable to any substantial understatement of income tax or to

**[*32]** negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1) and (2).  Under section 7491(c), the Commissioner has the burden of production to show that the imposition of a penalty under section 6662(a) is appropriate.  Respondent has met this burden by presenting evidence that petitioners had an underpayment attributable to a substantial understatement of income tax.

No penalty will be imposed under section 6662(a) if the taxpayer establishes that he acted with reasonable cause and in good faith.  Sec. 6664(c)(1).  Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional or an honest misunderstanding of the law that is reasonable in light of all the facts and circumstances.  Sec. 1.6664-4(b), Income Tax Regs.  The taxpayer has the burden of proving that he acted with reasonable cause and in good faith.  Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Section 6662(d) defines "substantial understatement" as the greater of:  (1) 10% of the amount of tax required to be shown on the return; or (2) $5,000.  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Sec. 6662(c).

**[*33]** On their tax returns, petitioners reported income tax due of $10,337, $27,650, and $653 for tax years 2003, 2004, and 2005, respectively. Petitioners' only argument is that these amounts were correct and therefore no substantial understatement exists. However, respondent's position, as sustained by the Court, is that the correct amounts required to be shown on those returns were $63,366, $74,874, and $32,878. Consequently, petitioners substantially understated their income tax for each of the years at issue.[19] Respondent has met his burden of production in showing that the imposition of the section 6662(a) penalty was appropriate. Petitioners make no showing that they acted with reasonable cause and in good faith in claiming the deductions at issue. Accordingly, petitioners are liable for the accuracy-related penalty under section 6662(a) for tax years 2003, 2004, and 2005.

The Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

---

[19]The understatements for tax years 2003, 2004, and 2005 were $53,049, $47,224, and $32,225, respectively. Each of these amounts are greater than 10% of the amount required to be shown for each respective year ($6,337 for 2003, $7,487 for 2004, and $3,288 for 2005).

**[*34]** To reflect the foregoing,

<u>Appropriate decisions</u>

<u>will be entered</u>.