T.C. Memo. 2016-187

UNITED STATES TAX COURT

HERB VEST, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15351-13, 15352-13,        Filed October 6, 2016.
15353-13.

Herb Vest, pro se.

<u>Tanya S. Wang</u> and <u>Duy P. Tran</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  In these consolidated cases the Internal Revenue Service
(IRS or respondent) determined the following deficiencies in petitioner's Federal
income tax:

[*2]

| Year | Deficiency |
|------|-----------|
| 2008 | $1,096,171 |
| 2009 | 1,409,469 |
| 2010 | 1,485,659 |

Petitioner initially contended that the notice of deficiency for 2008 was barred by the period of limitations under section 6501,[1] but he conceded that issue at trial. The issues remaining for decision are: (1) whether petitioner's investigation of the circumstances surrounding his father's death was an activity "not engaged in for profit" within the meaning of section 183; and (2) whether the sale of assets between related partnerships petitioner controlled was ineligible for installment sale treatment under section 453(g) because the transaction had a principal purpose of avoiding Federal income tax. We resolve both questions in respondent's favor.

FINDINGS OF FACT

The parties filed a stipulation of facts and accompanying exhibits that are incorporated by this reference. Petitioner is a certified public accountant who

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[*3]** resided in Texas when he filed his petitions. In 1983 he founded a very successful financial services firm; in 2001 the shareholders sold that business for $127.5 million. This yielded petitioner a very substantial profit. He then embarked on two sets of activities that gave rise to this tax controversy.

A.    Section 183 Issue

In 1946, when petitioner was two years old, his father was found hanging by the neck in the bathroom of his shop in Gainesville, Texas. The death was originally ruled a suicide. In 2003 petitioner received an anonymous letter asserting that unidentified residents of Gainesville had murdered his father and staged it to look like a suicide. Having realized a large gain on the sale of his business, petitioner had the means to devote significant time and resources to investigating the circumstances of his father's death.

Beginning in 2003 petitioner caused partnerships he controlled to pay at least $6.4 million to private investigators, forensic experts, morticians, and writers to assist him in solving this mystery and reporting the results. In January 2006 one of his investigators wrote a report concluding that his father's death had in fact been a homicide. The report found, however, that no plausible suspects among Gainesville residents could be identified; that no further leads existed; and that additional time spent investigating the homicide would not prove fruitful.

**[*4]** Undeterred, petitioner continued his investigation. His focus shifted to the possibility that his father had been killed by government agents in the wake of World War II. He spent considerable effort gathering information, a major feat given how much time had elapsed since the relevant events occurred. Petitioner believed that, if he gathered enough credible evidence, the story of his father's death could be successfully adapted into a book or a movie.

In November 2007 petitioner hired a writer to draft a manuscript. Nine months later petitioner received a 96-page partial draft describing the known circumstances of his father's death. This draft was never completed. There is no evidence that petitioner or anyone else did any further work on this draft during 2008-2010, the tax years at issue.

Before 2008 petitioner worked with a public relations firm to publicize his story and look for a buyer interested in commercializing it. There was apparently some interest; his father's death was the subject of one episode of a television show. Although this episode generated some publicity, it produced no revenue.

By January 2008 petitioner had been investigating his father's death for five years. As of that time, his investigative activities had not generated a single dollar of revenue. Those activities generated no income during 2008, 2009, or 2010, and petitioner had no reasonable prospect of generating future income. Petitioner

**[*5]** never developed a business plan for commercializing his father's story. He has no professional background in writing, book publishing, or media. He did not modify the scale or scope of his investigative activities during 2008-2010 in an effort to minimize the substantial losses he was incurring.

From 2003 onwards petitioner conducted his investigative activities through various partnerships that he controlled. The initial entity was HD Vest Investigations, LLC, of which petitioner owned 99%. That entity reported losses of approximately $1.1 million from homicide-related investigative activities during 2003-2005.

In October 2003 petitioner created Truebeginnings, LLC (TB), which was principally owned by petitioner and his then wife. TB's major activity was operation of a dating website. It separately incurred losses of $610,000 from homicide-related investigative activities during 2005-2007.

In August 2006 petitioner created Harold E. Vest, H.W. Powers & Son LLC (HVPS), which he owned 100% directly or via passthrough partners. During 2008-2010 HVPS was principally engaged in investigating the circumstances of petitioner's father's death. HVPS reported aggregate losses of approximately $3.8 million from these investigative activities during 2008-2010. All of these losses flowed through to petitioner.

**[*6]** B.      Installment Sale Issue

TB at all times has been taxed as an accrual-basis partnership. During 2008-2010 petitioner and his then wife owned 85% of TB's membership interests, giving him control of its operations. TB in turn owned 100% interests in two other partnerships, H.D. Vest Advanced Systems, LLC (VAS), and Metric, LLC (Metric).

In the course of its activities TB developed technology that helped optimize the delivery of Internet ads. In January 2008 TB sold to VAS and Metric computer equipment with appraised values of $454,825 and $412,000, respectively; after accounting for cost bases and depreciation, these sales produced an aggregate gross profit of $338,683. TB concurrently sold to VAS intangible assets with an appraised value of $2,885,175; because TB had a cost basis of zero in these assets, that sale produced a gross profit of $2,885,175.

In exchange for the transferred assets, VAS and Metric issued to TB promissory notes bearing an annual interest rate of 10%. Interest was to accrue annually, with the entire principal plus accrued interest payable in January 2018. TB received no payments of principal or interest from VAS or Metric during 2008, 2009, or 2010.

**[\*7]**   On its Form 1065, U.S. Return of Partnership Income, for 2008, TB reported on the installment basis its gain from the asset sales to VAS and Metric.  TB included in its return Forms 6252, Installment Sale Income, reporting aggregate gross profit of $338,683 from the sales of computer equipment and gross profit of $2,885,175 from the sale of intangible assets.  On line 6 of its Form 1065 for 2008, TB reported net gain from Forms 4797, Sales of Business Property, in the aggregate amount of $29,798 (apparently representing depreciation recapture).[2]  For their part, VAS and Metric claimed stepped-up bases in the transferred assets of $3,340,000 (i.e., $2,885,175 + $454,825) and $412,000, respectively, which yielded them amortization deductions of $192,345 and $22,579, respectively, for each of the taxable years 2008, 2009, and 2010.

In August 2012 petitioner filed a bankruptcy petition in the U.S. District Court for the Eastern District of Texas.  As a result, petitioner's shares of the partnership items of TB and HVPS were converted to nonpartnership items.  That conversion was effective as of the date the bankruptcy petition was filed.  See sec. 6231(c)(1)(E); sec. 301.6231(c)-7(a), Proced. & Admin. Regs.

---

[2]TB reported no gain from the asset sales to VAS or Metric on its Form 1065 for 2009 or 2010.

**[*8]** C.     The IRS Audit

The IRS examined TB's and HVPS' returns for 2008-2010 and disallowed the deductions relating to petitioner's homicide-related investigative activity on the ground that this activity was "not engaged in for profit." See sec. 183(a). During the examination of TB's returns the IRS also concluded that TB's asset sales to VAS and Metric did not qualify for installment sale treatment. The IRS determined that TB, VAS, and Metric were "related persons" under section 453(g)(1) and that petitioner had failed to establish that the transaction "did not have as one of its principal purposes the avoidance of Federal income tax." See sec. 453(g)(2).

For all three years at issue petitioner had net operating losses (NOLs) that were sufficient to eliminate his regular tax liabilities. However, the Code significantly limits a taxpayer's NOL deduction for purposes of computing the alternative minimum tax (AMT). See sec. 56(a)(4), (d). After disallowing the losses from his investigative activities and the claimed installment sale reporting of TB's $3.2 million gain, the IRS determined that petitioner had substantial alternative minimum taxable income (AMTI) for each year. Specifically, the IRS determined AMTI of $4,267,029 for 2008, $5,772,075 for 2009, and $5,597,946 for 2010.

[*9] Applying the applicable AMT rates, the IRS determined AMT liabilities and tax deficiencies as follows:

| Item | 2008 | 2009 | 2010 |
|---|---|---|---|
| AMT | $1,189,884 | $1,614,431 | $1,565,675 |
| Less: credit | -0- | (2,000) | (2,000) |
| Plus: self-employment tax | -0- | 19,024 | 6,513 |
| Less: AMT per return | (93,713) | (221,986) | (84,529) |
| Deficiency | 1,096,171 | 1,409,469 | 1,485,659 |

On September 20, 2012, respondent issued petitioner timely notices of deficiency for 2008-2010.[3] After the automatic bankruptcy stay was lifted, see 11 U.S.C. sec. 365(a)(8) (2012), petitioner timely filed his petitions in these three cases, which were consolidated for trial, briefing, and opinion.

## OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The

---

[3]Petitioner initially filed petitions in this Court in response to notices of final partnership administrative adjustment issued to TB and HVPS. Because petitioner's August 2012 bankruptcy filing converted his shares of all partnership items to nonpartnership items, he no longer had an interest in those proceedings, and those cases were subsequently dismissed.

[*10] taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. Petitioner does not contend that the burden of proof should shift to respondent under section 7491(a) as to any issue of fact; if he had advanced that contention it would be unpersuasive because he did not "introduce[] credible evidence" with respect to the relevant factual issues. See sec. 7491(a)(1). The burden of proof thus remains on petitioner.

A.    Section 183 Issue

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." To be entitled to deductions under this section, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988). If an activity is not engaged in for profit, no deduction attributable to it is allowed except to the extent of gross income derived therefrom (reduced by deductions that would be allowable regardless of whether the activity was engaged in for profit). Sec. 183(b). Thus, losses are not allowable for an activity that a taxpayer carries on primarily for sport, as a hobby, or for recreation. Sec. 1.183-2(a), Income Tax Regs.

**[*11]** Petitioner bears the burden of proving that he conducted his investigation into the circumstances of his father's death with the principal objective of making a profit. See Giles v. Commissioner, T.C. Memo. 2005-28, 89 T.C.M. (CCH) 770, 775. Although a reasonable expectation of profit is not required, the taxpayer must conduct the activity with the dominant hope and good-faith intention of earning positive income. Hulter, 91 T.C. at 392; sec. 1.183-2(a), Income Tax Regs. We determine whether the taxpayer has the requisite profit motive on the basis of all surrounding facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. In making this determination, we accord greater weight to objective facts than to the taxpayer's subjective statement of intent. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(a), Income Tax Regs.[4]

The regulations set forth a nonexclusive list of nine factors relevant in ascertaining whether a taxpayer conducts an activity with the intent to earn a profit.

---

[4]Where a partnership is involved, the analysis of profit motive must be made at the partnership level. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Brannen v. Commissioner, 78 T.C. 471, 501-505 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984). Since petitioner controlled all the partnerships and was the only significant actor, the partnership's objectives cannot meaningfully be distinguished from his own.

[*12] Sec. 1.183-2(b), Income Tax Regs. The factors listed are: (1) the manner in which the taxpayer conducts the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort spent by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Ibid.

No factor or group of factors is controlling, nor is it necessary that a majority of factors point to one outcome. See Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b), Income Tax Regs. Certain factors may be accorded more weight in a particular case because they have greater salience or persuasive value as applied to its facts. See Crile v. Commissioner, T.C. Memo. 2014-202, 108 T.C.M. (CCH) 372, 379; Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (noting that all nine factors do not necessarily apply in every case).

None of the regulatory factors weighs meaningfully in petitioner's favor. For the following reasons, we conclude that he did not engage in the investigation

[*13] of his father's death with the primary and genuine purpose of making a profit.

(1) Petitioner has never earned an annual profit from his homicide-related investigative activity. See Golanty, 72 T.C. at 427 (noting that a series of substantial losses suggests the lack of a profit motive); sec. 1.183-2(b)(6), Income Tax Regs. Indeed, petitioner did not generate a single dollar of revenue from this activity in any year from 2003 through 2010. Over that time, petitioner's reported losses were continuous and substantial. This strongly suggests that he did not engage in this activity to make a profit.

(2) Petitioner did not conduct his activity in a businesslike manner. He had no professional training or experience in writing, publishing, or media. He had no budget or business plan. See Bronson v. Commissioner, T.C. Memo. 2012-17, 103 T.C.M. (CCH) 1112, 1116 ("Characteristics of a businesslike operation include the preparation of a business plan[.]"), aff'd, 591 F. App'x 625 (9th Cir. 2015). Before 2008 he engaged public relations professionals and hired a writer to produce a manuscript, but no further work on that manuscript was ever done. Although he devoted many hours to this project, he showed little interest in actually making it profitable. See Johnson v. Commissioner, T.C. Memo. 2012-231, 104 T.C.M. (CCH) 178, 181-182. Rather, he pursued his investigation with

**[*14]** no apparent concern about the magnitude of his losses or the future revenues he would have to generate in order to recoup those losses. An "opportunity to earn a substantial ultimate profit in a highly speculative venture" may indicate a profit motive despite current losses. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner introduced no evidence suggesting that his book publishing venture had an unusually high profit potential.

(3) Petitioner did not adjust the scale or direction of his activities as a profit-maximizing person would do. See sec. 1.183-2(b)(1), Income Tax Regs. He did not modify his operations as his losses mounted. After his investigator in 2006 found the anonymous letter to be a dead end, petitioner did not curtail his expenditures or abandon the project to cut losses. See Crile, 108 T.C.M. (CCH) at 380 (noting that a taxpayer's change of operating methods or abandonment of unprofitable activities may indicate a profit objective). Instead he doubled down: He incurred several million dollars of additional investigative expenses during 2007-2010 and reported losses even larger than those he had reported previously. Although petitioner had earlier been successful in his financial planning business, we do not find those accomplishments to be a good predictor of success as an author, book publisher, or producer. Cf. sec. 1.183-2(b)(5), Income Tax Regs.

**[\*15]** (4) Petitioner had no expectation that assets used in his investigative activity would appreciate in value. Cf. sec. 1.183-2(b)(4), Income Tax Regs. Indeed, that activity did not deploy or develop any meaningful assets apart from the research he accumulated and the 96-page manuscript, which remained an incomplete draft. The possibility that these assets would appreciate in value was extremely small.

(5) Petitioner had strong personal motives for conducting his activity, and the circumstances suggest that it was essentially a pastime. See sec. 1.183-2(b)(9), Income Tax Regs. After the sale of his business in 2003, petitioner had significant financial resources and leisure time available. He was naturally interested in learning more about his father's death and proving that it was a murder rather than a suicide. Aside from this family aspect, petitioner clearly found the mystery surrounding his father's death to be very engaging, as he expended significant financial resources pursuing multiple theories. When the chance for profit is small relative to the potential for gratification or self-fulfillment, the latter emerge as the taxpayer's likely motivations. See White v. Commissioner, 23 T.C. 90, 94 (1954), aff'd per curiam, 227 F.2d 779 (6th Cir. 1955). We conclude that petitioner's investigative efforts were the product of a personal desire to uncover the cause of his father's death, not an attempt to engage in a profitable business.

**[*16]** In sum, we find and hold that petitioner did not incur the expenses related to the investigation of his father's death in an activity conducted with the genuine purpose of making a profit. Under section 183, the amount of allowable deductions attributable to his investigative activity is thus limited to the gross income he derived therefrom. Because he derived no gross income from that activity during 2008-2010, he is not entitled to any deductions.

B.     Installment Sale Issue

Generally, gain from the sale of property is taxed to the seller in the year of the sale. Secs. 61(a)(3), 1001(c). Section 453 provides an exception to this rule, allowing income from an installment sale to be reported as payments are received. The purpose of the installment method of reporting income is to alleviate the hardship on taxpayers who would otherwise recognize the entire gain in year one, without receiving enough cash to pay the resulting tax. See Shelton v. Commissioner, 105 T.C. 114, 117-118 (1995). Under the installment method, the tax due is instead matched with the payments received.

Section 453(a) provides that income from an installment sale shall be taken into account for purposes of taxation under the installment method. Section 453(b) defines an installment sale as a "disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposi-

[*17] tion occurs."  Section 453(c) provides that "the income recognized for any taxable year from a disposition * * * [shall be] that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price."

Installment sale treatment allows an accrual-basis taxpayer (such as TB) to defer the reporting of gain during the period of the installment note--here, ten years--thus minimizing current tax.  However, section 453(g)(1) provides that this treatment generally is not available "[i]n the case of an installment sale of depreciable property between related persons."  In the case of a related-party sale of depreciable property, installment sale treatment is available only "if it is established to the satisfaction of the Secretary that the disposition did not have as one of its principal purposes the avoidance of Federal income tax."  Sec. 453(g)(2).

TB, VAS, and Metric were clearly "related persons":  TB owned 100% of VAS and Metric, and petitioner controlled all three entities.  The computer equipment and intangible assets that TB sold to VAS and Metric constituted "depreciable property" within the meaning of section 453(g) because they were subject to allowances for depreciation and/or amortization.  See secs. 167(a), 197(a), (f)(7). Petitioner thus bears the burden of proving that tax avoidance was not among the principal purposes of the asset sale transaction.

**[*18]** Section 453(g)(2) resembles other Code sections providing that certain tax treatment will be available only if the taxpayer establishes that the plan or transaction did not have "as one of its principal purposes the avoidance of Federal income tax." See, e.g., secs. 306(b)(4), 453(e)(7). We have ruled that a taxpayer in such cases can satisfy his burden of proof only by submitting "evidence [that] clearly negate[s] an income-tax-avoidance plan." Tecumseh Corrugated Box Co. v. Commissioner, 94 T.C. 360, 381-382 (1990) (addressing section 453(e)(7)), aff'd, 932 F.2d 526 (6th Cir. 1991). We have described the taxpayer's burden in such cases as "a heavy one." Pescosolido v. Commissioner, 91 T.C. 52, 56 (1988) (addressing section 306(b)(4)), aff'd, 883 F.2d 187 (1st Cir. 1989). In ascertaining the true purpose of the transaction, we accord more weight to objective facts than to the taxpayer's "mere denial of tax motivation." Id. at 60. We also consider the enhanced depreciation deductions available to the related buyer in deciding whether the seller had a principal purpose of avoiding tax. Guenther v. Commissioner, T.C. Memo. 1995-280, 69 T.C.M. (CCH) 2980, 2983.

The substance of the transaction at issue clearly reveals a principal purpose of tax avoidance. Notwithstanding the asset sale, petitioner through TB retained full control over the ad-optimization business. By use of installment reporting, TB aimed to defer for 10 years virtually all the tax on its $3.2 million gain, while VAS

**[*19]** and Metric would receive stepped-up bases in, and be able to claim correspondingly large depreciation or amortization deductions on, the assets transferred. See Guenther, 69 T.C.M. (CCH) at 2983.

This tax-avoidance purpose is particularly clear with respect to the intangible assets sold to VAS. Those assets had a zero cost basis in TB's hands, thus yielding zero amortization deductions to it. But VAS claimed a stepped-up basis in those assets of $2,885,175, yielding amortization deductions of $192,345 annually. The enhanced amortization deductions claimed by VAS and Metric, totaling $644,772 for 2008-2010 alone, dwarf the $29,798 gain that TB reported for 2008.

Petitioner testified at trial that the asset sale had a valid business purpose, namely, to isolate distinct assets in three separate partnerships as a prelude to a possible sale. This rationale is unconvincing: It is not clear why a potential buyer would care in which entity the assets happened to be located. In any event, the existence of a valid business purpose for a transaction does not negate the conclusion that "one of its principal purposes" was the avoidance of tax. Sec. 453(g)(2); Tecumseh Corrugated Box Co., 94 T.C. at 381.

Petitioner also urged that he could not have had a tax-avoidance purpose because he had sizable NOLs for each year. But while these NOLs eliminated his

[*20] regular tax liability, they left him vulnerable to the AMT.  See supra pp. 8-9.

The combination of deferring tax on TB's $3.2 million gain and securing $214,926

of additional annual amortization deductions in VAS and Metric operated to re-

duce substantially petitioner's AMT liabilities for 2008, 2009, and 2010.  This is

evidence of a tax-avoidance purpose.  Considering the significant and undeserved

tax benefits that petitioner, VAS, and Metric received, petitioner has failed to

satisfy his burden of establishing that tax avoidance was not one of the principal

purposes of the asset-sale transaction.

      To reflect the foregoing,

Decisions will be entered

for respondent.
